**In the Matter of Robert C. PRICE.**

**No. 879S209.**

Supreme Court of Indiana.

Jan. 15, 1982.

William P. Wooden, Douglas B. King, Indianapolis, for respondent.

Thomas Opsut, Indianapolis, for Disciplinary Commission.

PER CURIAM.

This action has been brought by the Indiana Supreme Court Disciplinary Commission on a Verified Complaint containing three charges of misconduct. Pursuant to Admission and Discipline Rule 23 a Hearing Officer has held a hearing in this cause and has reported to this Court his Findings of Fact. The Respondent has challenged these findings in a Petition for Review and both sides have briefed their respective positions. Additionally, at the request of the Respondent, oral argument has been conducted before the Court.

Having considered all matters presented and having heard oral argument of the parties, this Court now generally finds that the Respondent, Robert C. Price, is a duly licensed and practicing attorney in the State of Indiana. He was admitted to the Bar of this State in 1974.

Under Count I of the Verified Complaint filed in this cause, generally charging the Respondent with giving untruthful information to a Grand Jury, this Court now finds that on April 29, 1977, Ernest Sherer (hereafter Sherer) was seriously injured in an automobile accident. He was paralyzed and confined to hospitals in Terre Haute and Indianapolis until his death on February 7, 1978. Sherer's half sister, Ruth Patterson (hereafter Patterson) on June 29, 1977, asked the Respondent to represent Sherer in securing settlement from the personal injury accident of April 29, 1977.

Patterson also asked the Respondent to accompany her to the Greene County Welfare Department to obtain Medicaid benefits for Sherer. On June 29, 1979, Respondent did accompany Patterson to the Greene County Welfare Department. On this date, the Respondent saw Melanie Thompson, Intake Caseworker for the Welfare Department, and explained to her that Patterson was there to make an application for medical benefits. Respondent left and was not present when the application was actually completed and signed.

Subsequently, Respondent contacted the Greene County Welfare Department on numerous occasions by telephone and in person concerning the status of the Medicaid application for Sherer. The Respondent called Melanie Thompson approximately six times in July, 1977, to inquire about the status of the application. In one of these conversations with Melanie Thompson, Respondent, on request, supplied Thompson with the name of Sherer's physician so that the application could be completed and submitted for approval. The Respondent telephoned Susan Street, Caseworker for the Greene County Welfare Department, in July, 1977, and again on August 4, 1977, and on both occasions asked if Sherer would remain eligible for Medicaid if Sherer either bought or was given his sister's interest in the house that Sherer resided in before the accident.

On March 2, 1978, the Respondent testified, under oath, before the Greene County Grand Jury as follows:

Q. Were you aware that Ruth Patterson had applied for Medicaid benefits?

A. At some time, in all this, I became aware of it. I think, Ernie mentioned that he had either ask (sic) her or she had on her own gone to the Welfare Department and applied for Medicaid benefits.

Q. Did you accompany Ruth Patterson to the Greene County Welfare Department? When she applied for those benefits?

A. No, in fact, I didn't know she had done it until long after she had done it.

Q. Do you recall when you first became aware that she had applied?

A. It was before the settlement. It was before we received the settlement but I'm not sure what the date was.

In his presentations to this Court, Respondent asserts that he did not intentionally or knowingly deceive or mislead the Grand Jury. Pointing to the testimony in the record indicating that Patterson completed the Medicaid application at home, Respondent argues that he did not intentionally misrepresent the facts when he responded to the Grand Jury inquiry as to whether or not he accompanied Patterson when she applied for benefits. Respondent concludes that, by reason of the failure of proof of an intentional misrepresentation, there is insufficient evidence to establish misconduct.

We do not concur in the conclusion argued by Respondent. This Court has held that circumstantial evidence is sufficient to establish the general intent element of fraud or misrepresentation. *In re Vincent,* (1978), 268 Ind. 101, 374 N.E.2d 40; *England v. State,* (1968), 249 Ind. 446, 233 N.E.2d 168. Our findings under Count I demonstrate that Respondent, together with Ruth Patterson, initiated the application process on June 29, 1977. Thereafter, Respondent was in regular contact with caseworkers of the department and kept a close check on the progress of the application. There is ample testimony that throughout July and August Respondent took an active part in following the development of the Sherer application. Respondent's testimony before the Greene County Grand Jury gives a clear indication that he did not of his own knowledge know of the application, but had heard about it from Sherer. Respondent stated that he, in fact, did not know that "she (Patterson) had done it (applied) until long after she had done it." Contrary to this statement, it is clear from the record in this case that Respondent had personal knowledge that Patterson had gone to the Welfare Department on June 29, 1977, to apply for Medicaid

benefits and that throughout July and August ·Sherer's application was being processed by the Welfare Department.

In view of these considerations, it appears to this Court that the Respondent's statements to the Grand Jury were, at best, misleading. Accordingly, this Court now finds that the Respondent engaged in conduct involving misrepresentation, conduct prejudicial to the administration of justice, and conduct that adversely reflects on his fitness to practice law in violation of Disciplinary Rules 1–102(A)(4), (5) and (6) of the *Code of Professional Responsibility.*

The charges under Counts II and III also stem from Respondent's dealings with the Welfare Department. In general, it is alleged that Respondent concealed from the Welfare Department a settlement received by his client, Sherer, and counseled this client to engage in defrauding the Welfare Department. By reason of this alleged misconduct, Respondent is charged with circumventing a Disciplinary Rule, engaging in illegal conduct involving moral turpitude, engaging in conduct involving dishonesty, fraud, deceit or misrepresentation and engaging in conduct prejudicial to the administration of justice which adversely reflects on his fitness to practice law, such acts being in violation of Disciplinary Rules 1–102(A)(2), (3), (4), (5) and (6) of the *Code of Professional Responsibility.* He is further charged with concealing or knowingly failing to disclose that which he is required by law to reveal, counseling his client in conduct the Respondent knows to be illegal or fraudulent and failing to call upon his client to rectify the perpetration of a fraud, such conduct being in violation of Disciplinary Rules 7–102(A)(3) and (7) and 7–102(B)(1).

Upon examination of the matters now before this Court, we find, relative to the charges under Counts II and III, that on July 6, 1977, the Respondent agreed to represent Sherer to recover damages arising out of the above noted automobile accident. A lawsuit was filed and settlement in the amount of $27,000 was reached with the defendant's insurance carrier. On August 3, 1977, Sherer executed a release of all claims against this defendant. Out of this settlement, $2,000 was paid to Sherer's hospital; and on August 11, 1977, Respondent received two cashier's checks, one payable to Sherer in the amount of $13,800 and the other payable to the Respondent in the amount of $11,200.

None of the proceeds were deposited in Sherer's personal bank account, but were placed, at the direction of Sherer, in a client's trust account under Respondent's name. A total of $14,200 was placed in such account, the remainder going for legal fees ($10,800) and the direct payment to the hospital ($2,000). Out of this client's trust account, $1,350 was paid for additional legal services rendered by the Respondent to Sherer, $5,155 was paid to Sherer's sister for her interest in the Sherer residence, $1,025.63 was paid to settle a debt owed to a bank by Sherer's deceased mother, $377.04 was paid for expenses incidental to maintaining Sherer's house, and $100 was paid to an attorney to secure the revocation of a Power of Attorney held by Sherer's half-sister. The remaining balance of $6,192.33 was deposited by the Respondent in the estate account opened by the Respondent after Sherer's death.

In August, 1977, Respondent talked with Melanie Thompson, the Intake Caseworker noted under Count I. At that time, Respondent informed Thompson that a settlement on behalf of Sherer was imminent and questioned her about the effect the settlement would have on Sherer's Medicaid application. Respondent was advised by Thompson that Sherer's eligibility would have to be redetermined after the settlement amount had been received and Respondent was further requested to notify the department when Sherer had received the settlement; Respondent replied, "OK". At the time of this conversation, the settlement had been entered, the release had been signed and the checks had been received, but had not cleared. A similar representation was made to Susan Street, the Welfare Department Caseworker noted under Count I, but in all conversations with Street, Respondent never informed her that a settlement had been received.

Sherer's application for Medicaid benefits was approved on August 31, 1977, with the effective date of eligibility being fixed at May 1, 1977. More than $47,000 in benefits were paid directly to the suppliers of medical services on behalf of Sherer from April 30, 1977, until Sherer's death on February 7, 1978. The question of the possibility of additional assets came to light during an audit of the case.

Relative to Counts II and III, Respondent contends that during his conversations with caseworkers Street and Thompson in August of 1977, he made sufficient disclosure that a settlement had been reached. In the alternative, he argues that he did not make a disclosure at that time because he did not consider the settlement final until the checks had cleared. Respondent further proposes that his subjective understanding that he had revealed what he thought was the status of the claim proves that his action was not a knowing concealment of a material fact.

We find this argument unpersuasive. The evidence is clear that when Respondent spoke of an "imminent" settlement and questioned the caseworkers about its possible effect on Sherer's status, he in fact had the check and knew the exact amount Sherer had received. Respondent spoke with Caseworker Street concerning Sherer's welfare case on approximately six occasions during the period from June 29, 1977, through February of 1978. Yet, on none of these occasions did he advise Street or anyone else at the Welfare Department that his client had received the settlement. He did not inform the Welfare Department of the settlement until after Sherer's death on February 7, 1978.

■ The Disciplinary Rules in whose terms the charges under Counts II and III are couched, do not require a specific showing of intent or knowledge, save for Disciplinary Rule 7–102(A)(3) which prohibits a lawyer from concealing or knowingly failing to disclose that which he is required by law to disclose. The scienter element of a disciplinary charge may be analogized to what constitutes "knowingly" in a criminal charge. The Indiana General Assembly has defined "knowingly" as it relates to criminal culpability as follows:

(b) A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so. I.C. 35–41–2–2(b).

The record before us demonstrates that Respondent knew he had received assets belonging to his client and was interested in their effect on Sherer's eligibility. He did not reveal that fact during his several conversations with the caseworkers. In light of these facts, we must conclude that he was aware of what he was doing and engaged in this conduct knowingly.

■ Respondent also denies any duty on his part to disclose the settlement. The findings establish that Respondent was Sherer's attorney; he contacted the Welfare Department on numerous occasions concerning Sherer's case; he discussed the possibility of a settlement and promised to notify the Welfare Department as to when and how much was received. By his affirmative representations, Respondent led the caseworkers to look to him for information concerning his client and, specifically, for information concerning the settlement. Thus, Respondent placed himself under a duty to keep the Welfare Department informed.

Respondent also calls on the attorney-client privilege as a bar to his revealing information concerning the settlement. Disciplinary Rule 4–101(C) allows disclosure of client's confidences and secrets where the disclosure is permitted by the Disciplinary Rules, required by law or when the confidences involve the client's intention to commit a crime. We conclude that under the facts of this case, Respondent had a duty to disclose his receipt of assets on behalf of Sherer. We also take judicial notice that I.C. 12–1–7–28.1, repealed effective July 1, 1978, was in force and effect during the period in question. Such law provided that:

Any person who by knowingly making a false statement or representation or who by deliberate concealment of any materi-

al fact, or by impersonation or other fraudulent device, obtains or attempts to obtain or aids and abets any person to obtain medical assistance to which he is not entitled, shall be guilty of a misdemeanor and on conviction thereof shall be fined no more than one thousand dollars ($1,000) or imprisoned for a term not to exceed six (6) months or punished by both such fine and imprisonment.

In light of this statute, we further conclude that under the circumstances, Respondent's disclosure of the settlement was required by law.

In that Counts II and III charge Respondent with engaging in illegal conduct, assisting his client in illegal conduct and failing to disclose the same, we also take judicial notice that I.C. 12–1–7–24 was in full force and effect at the time in question. Such statute provides that:

Sec. 24. If, at any time during the continuation of medical assistance under the provisions of this act, the recipient becomes the owner of any property, income or resources in excess of the amount owed when his eligibility was determined, he immediately shall notify the county department of the receipt of the possession of such property or income and the county department, after investigation, shall recommend to the state department either the cancellation of medical assistance or alteration of the amount thereof in accordance with the circumstances. Any assistance paid after the recipient has come into possession of such property, income or resources and in excess of his needs, shall be recoverable by the state department from the recipient or his estate.

It is Respondent's contention that before he could be found to have aided and abetted his client in violating these statutes, the Commission must prove that Sherer committed a fraud. This is not a criminal trial but a disciplinary proceeding to which criminal law principles do not necessarily apply. Respondent does not stand accused as an accessory to a crime; he is charged with violating professional rules of ethics. By the failure to notify the Department of Welfare and his placing Sherer's funds in a client's trust account, he rendered such assets difficult to trace back to Sherer and facilitated his client in maintaining the low-asset status necessary for receiving Medicaid benefits. By these actions, Respondent aided Sherer in receiving medical assistance to which Sherer was not entitled.

■ In light of the foregoing findings and considerations, we conclude that Respondent did engage in the misconduct charged under Counts II and III of the complaint. Respondent knowingly failed to disclose his receipt of settlement funds on behalf of Sherer. Such disclosure was required by law and was permitted under Disciplinary Rule 4–101(C). This conduct is violative of Disciplinary Rule 7–102(B) of the *Code of Professional Responsibility.* Respondent, by his knowing failure to disclose, aided Sherer in obtaining benefits to which Sherer was not entitled in violation of I.C. 12–1–7–28.1(a). Such actions violated Disciplinary Rules 1–102(A)(3), (4) and (6) in that they constitute illegal conduct involving moral turpitude, conduct involving dishonesty and deceit and conduct which adversely reflects on Respondent's fitness to practice law.

Under the charges of Count III, the findings further establish that Respondent's failure to disclose his receipt of the settlement proceeds and his handling and disbursement of such funds facilitated Sherer in maintaining the low-asset status necessary for receiving Medicaid benefits and aided him in contravening the provisions of I.C. 12–1–7–24. By his actions, Respondent assisted his client, Sherer, in conduct which Respondent knew to be illegal. Respondent failed to call such illegal conduct to the attention of the Greene County Welfare Department. This conduct violates Disciplinary Rule 7–102(A)(7) and (B)(1) of the *Code of Professional Responsibility.*

Having found misconduct, we must now determine an appropriate disciplinary sanction. Initially, we note that Respondent is a relatively new attorney and that he had no prior experience in personal injury cases

when he was engaged to represent Sherer. The evidence does demonstrate, however, a level of professional misconduct which cannot be totally mitigated by inexperience. It appears to this Court that Respondent engaged in a deliberate course of conduct designed to circumvent the eligibility requirements fixed for Medicaid benefits. This course of action involved deceit and illegality. Were it not for his inexperience, Respondent's conduct could easily be viewed as an intolerable attempt at personal gain through the exploitation of an unknowing client. But we will not project such improper motivation. Hopefully, Respondent has learned a valuable lesson and after a period of suspension will be better able to meet the ethical standards required of all members of the Bar of this State.

Accordingly, it is hereby ordered that, by reason of the misconduct found in this case, the Respondent be, and he hereby is, suspended from the practice of law in the State of Indiana for a period of not less than one year beginning February 15, 1982.

Costs of these proceedings are assessed against the Respondent.

All Justices concur.