**In the Matter of John V. HAMPTON.**

**No. 385 S 75.**

Supreme Court of Indiana.

Jan. 24, 1989.

Jack A. Quirk, Muncie, for respondent.

Martin E. Risacher, Staff Atty. Indianapolis, for the Indiana Supreme Court Disciplinary Com'n.

PER CURIAM

This matter is before us on a Verified Complaint for Disciplinary Action charging the Respondent, John V. Hampton, with thirteen counts of professional misconduct.

A Hearing Officer appointed by this Court pursuant to Admission and Discipline Rule 23 has heard the matter and has tendered his findings of fact and conclusions of law. The Respondent has petitioned for review of the same. The Disciplinary Commission has filed its answer brief which the Respondent now challenges as being filed untimely and requests that it be struck.

■ Addressing the initial procedural issue, it is well established that the mere expiration of a time period does not constitute denial of procedural due process. *In re Wireman* (1977), 270 Ind. 344, 367 N.E. 2d 1368, cert. denied 436 U.S. 904, 98 S.Ct. 2234, 56 L.Ed.2d 402. The Respondent does not contend that he has been prejudiced by the delay or otherwise denied procedural due process, but argues, without supporting authority, that, as a matter of policy, the filing periods should be strictly enforced. We are unpersuaded by this argument and now deny Respondent's request that the Commission's answer brief be stricken.

The established review process in attorney disciplinary cases involves a *de novo* examination of all matters presented on review. While the Hearing Officer's findings receive emphasis, they are not necessarily controlling. *In re Phillips* (1986), Ind., 486 N.E.2d 1031. Respondent's challenges will be resolved within the context of this review process and this Court's ultimate determination of the findings of fact and conclusions of law.

The charges against the Respondent arise out of misappropriation of funds during his tenure as License Branch Manager of Delaware County. Count I of the complaint involves allegations that the Respondent made a false statement under oath to the Delaware County Grand Jury; Counts II through VI involve allegations that the Respondent mishandled state and county funds; Counts VII, VIII and IX charge that the Respondent engaged in illegal acts involving conspiracy and corrupt business practices; Counts X through XIII involve allegations that the Respondent hired and paid "ghost employees".

Upon review of all matters tendered in this case, we find that John V. Hampton is an attorney licensed to practice in Indiana and is, thus, subject to this Court's jurisdiction. In the Spring of 1978, the Commissioner of the Bureau of Motor Vehicles appointed the Respondent to be the manager of the Delaware County License Branches. As the manager of the branches, the Respondent was responsible for, among other matters, the accounting, managing and reporting of all funds collected through the branches within Delaware County. The Respondent employed several persons including Marshall K. Willis, a long-time confidant. Willis was a certified public accountant who was hired to perform all accounting duties regarding the operations of the Delaware County license branches. Willis handled all funds and bank accounts for the license branch including the borrowing and depositing of funds. A branch office manager, Judith Goe, handled the day to day operations. The Respondent came into the branch no more than once a week and turned his duties over to Willis and Goe.

The fees collected through the operation of the licence branches included fees belonging to the State, the County, as well as fees generated for the operation of the branch. The collected funds were allocated to the County, the State and the Branch pursuant to Bureau of Motor Vehicle Guidelines and Indiana law. The money for the State and County accounts was public money and was earned when collected. The fees were deposited in 1) a State Fee Account, 2) a County Excise Tax Account, and 3) the Branch Manager's Account. There was a statutory requirement, pursuant to IC 5-12-1-1 and 5-12-1-3 (now superseded by IC 5-13-6 et seq), that public monies be deposited on a daily basis. However, strict procedures were not followed in the Indiana license branches.

It was the practice of the Delaware County License Branch during the period of 1978-1981 to place all fees collected into one account, the Clearing Account, and then to periodically transfer into the State, County and Branch accounts.

During the period of time Respondent was manager of the Delaware County License Branch, the Respondent had personal and family expenses paid from the Branch Manager's Account. These amounted to many thousands of dollars annually and included car, truck, mortgage payments, payments to various credit card accounts, payments to Sears, Penney's and other department stores, payments for repairs to Respondent's home, payments to remodel Respondent's law office and apartment building, as well as cash taken by Respondent and Respondent's wife for their use.

In 1982, the Respondent hired and paid a weekly salary to Ann Augustine, his private legal secretary, from accounts of the Delaware County License Branch. Ann Augustine was not assigned nor did she perform any duties for the Delaware County License Branch. In 1982 and 1983, the Respondent paid his children John P. Hampton, William A. Hampton and Marguerite Hampton, as employees of the license branch when they, in fact, had no assigned duties, did not perform any, and, much of the time, were full-time college students.

Funds belonging to the Branch Manager's account could be used by the Branch Manager for whatever purpose he desired, including personal matters. However, as a result of the extensive use of the funds in the Branch Manager's account on strictly personal matters, the account was frequently overdrawn and sometimes for several weeks at a time. In order to balance the Branch Manager's Account, it was common practice for officials of the Delaware County License Branches to transfer funds from the Clearing Account to the Branch Manager's Account prior to those funds being earned by the Respondent.

The transfer of such funds were considered loans by the Respondent and were represented as "cash advances" on liability accounts on a monthly financial statement prepared for and presented to the Respondent. The "loans" or "cash advances" amounted to thousands of dollars annually: $24,667.19 for 1978; $9,445.59 for 1979; $12,554.12 for 1980; $8,824.46 for 1981;

$78,778.08 for 1982. No officials of the State of Indiana or the Delaware County Treasurer's office ever consented to or were even aware of these "loans" or "cash advances" to the Respondent of funds owing to the State or the County. In 1981 the Respondent told Willis, the accountant, to make whatever transfers were necessary to keep Respondent's Branch Manager's Account covered.

The Bureau of Motor Vehicles and the State Board of Accounts promulgated a set of accounting procedures to bring the County license branches into compliance with IC 5–12–1–3 (the Daily Deposit Law), to remove the branch manager's signature and his authority to withdraw funds from the County Excise account and the State account and to formally restrict the access to public monies. Under these procedures, which became effective on January 1, 1982, all fees were to be deposited daily in a Clearing Account. From the Clearing Account the funds had to be transferred, at least three times a week, into the State, County Excise and Branch Manager's Account according to an established allocation system. Authority to withdraw from the Clearing Account rested with the Branch Manager or the Commissioner of the Bureau of Motor Vehicles. Funds in the State account could be withdrawn only by the Commissioner of the Bureau of Motor Vehicles, and funds in the County account could be withdrawn only by the County Treasurer.

The new procedures were explained in detail in a memorandum and set of instructions distributed to all license branches. The Bureau of Motor Vehicles and the Indiana State Board of Accounts also held a meeting for the purpose of explaining the new procedures. The meeting was attended by two of Respondent's employees, Judith Goe and Mary Jane Upchurch. Thereafter, the employees met with the Respondent and the accountant, Willis, and fully explained the new requirements.

In the Fall of 1981, the Respondent and Willis discussed the idea of depositing branch fees into an interest bearing account. The Respondent advised Willis that it was Respondent's opinion that such a plan was legal.

On December 23, 1981, Willis opened an interest bearing savings account named "John V. Hampton Branch Account" which allowed for withdrawal only by Willis. In December of 1981, Willis began depositing into this account, checks mailed to the branch in payment of automobile registration fees and continued this practice until July of 1983. The savings account earned interest in 1981, 1982 and 1983; the interest was reported as income on Schedule C of Respondent's federal income tax return for 1982 and 1983. Judith Goe, the assistant branch manager, informed the Respondent of the account sometime in late December of 1981 or January of 1982. On February 12, 1982 the Respondent requested Willis to transfer $2,000 from the savings account to Respondent's law office account. Pursuant to the request, Willis obtained a deposit slip from Respondent's secretary and made the transfer.

From December of 1982 to January 1983, Willis transferred $203,400 from the savings account into his personal account and later loaned the money to a corporation in which he owned stock. Willis executed promissory notes for each transfer.

In the Spring of 1983, the Indiana State Board of Accounts, by its field examiner, William Gonser, conducted an audit of the Delaware County License Branches for the period of January 1, 1982 to December 31, 1982. Said audit revealed a shortage in the County Account and several unauthorized transfers of funds from the County and State accounts. Those transfers included $60,000 from the State License Fee Account to the Branch Clearing Account, four transfers totaling $25,000 from the County Excise Tax Account to the Branch Managers Account, and two transfers, totalling $11,000 from the County Excise Tax Account to the Branch Clearing Account.

Upon completion of the audit, the field examiner met with the Respondent and Willis for an exit conference, discussed the report and instructed the Respondent to immediately replace $32,000 to the County

account; the requested funds were replaced.

After being advised of the shortage, the State Examiner, M.F. Renner, telephoned the Respondent and inquired as to the problems causing such shortage. The Respondent advised Renner that the branch had difficulty meeting payroll and needed funds to pay the employees and other branch expenses. Renner informed the Respondent that transfers from the County and State accounts were not authorized and were illegal. By a letter of May 28, 1983, to Renner, the Respondent confirmed that he had been advised that the transfers should not be made and that the funds had been transferred so that license branch employees and expenses could be paid. The Respondent further stated that he had been unaware that such practice was improper but that now he would not allow this to happen again.

Thereafter, in July of 1983 the Delaware County Treasurer, Lawrence Walsh, learned that the County Account had insufficient funds to cover certain checks. After determining that the Treasurer's Transmittal Vouchers from the Delaware County License Branch indicated that a substantial amount of money was missing from the County Tax Funds Account, Walsh called Renner, the State examiner, and informed him of this fact. Field examiners were sent to Delaware County and another audit was conducted.

The second audit was for the period of January 1, 1983 to July 18, 1983. This audit indicated that, as of July 18, 1983, the State License Fee Account was short of $140,000 and the County Excise Tax Account was short of some $72,871; for a total shortage of 212,871. The audit also indicated unauthorized transfers, including two transfers totalling $140,000 from the State Account into the Branch Clearing Account and two transfers, totalling $115,000 from the County Excise Tax Account into the Clearing Account.

The State Board of Accounts conducted a third audit, this being a final audit covering Respondent's last date in office, from January 1, 1983 to August 30, 1983. This audit again revealed shortages, this time amounting to $289,969.38, and numerous unauthorized transfers from the State and County accounts. Willis eventually paid back $203,000.

During 1982 and 1983, the period of time for which the foregoing shortage and unauthorized transfers were reported on the audits, Respondent's legal secretary and three of his children were paid as employees of the Delaware County Branch without performing any services. During this period many of Respondent's personal expenses and purchases were paid through the Branch Manager's account.

Later during 1983, the Respondent testified as a witness before the Delaware County Grand Jury which was then in session investigating license branch irregularities. The Respondent testified to the following:

Q. Were you aware that transfers were being made, withdrawals were being made, transfers being made from those accounts and placed back into the clearing account, which is clearly illegal?

A. I was aware that there were transfers being made. I was not, as far as I knew at that time, my understanding was that this was a violation of procedures and that it was not in violation of the law.

Later on the Respondent also testified as follows:

Q. If you hadn't paid personal expenses and your children and your secretary and other things, could the branch have operated in a profit?

A. Probably would have been a lot closer if I hadn't taken any money out of it and if I hadn't taken the money to put my kids in school. There's no question about that, that would have been better, ...

The Hearing Officer concluded that the Respondent engaged in misconduct as alleged in Counts II, III, IV, V, VI, X, XI, XII and XIII, but not under Counts I, VII, VIII and IX.

On review before this Court, the Respondent strenuously denies any knowledge of any impropriety, specifically of the existence of an account under his name or of illegal transfers, and pleads ignorance of rules and laws which made the foregoing financial activities illegal. It is his contention that Willis had full control of all financial activities of the branch and acted alone in all instances; that the Respondent had no knowledge whatsoever of Willis' illegal activities and was, in fact, an innocent, trusting manager who was deceived by the man he trusted.

This Court has, in the past, had occasion to evaluate a specific scienter element of a disciplinary charge and has analogized the same to the definition of "knowingly" within the criminal law context. *In re Price* (1982) Ind., 429 N.E.2d 961. Although Disciplinary Rules 1–102(A)(3), (4), (5) and (6), under which the Respondent here is charged, are not specifically confined to "knowing" actions, a similar analogy can serve in examining the extent of knowledge necessary for proof under this Rule. The Indiana General Assembly has defined "knowingly" as it relates to criminal culpability to mean that a person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so. I.C. 35–41–2–2(b), *In re Price, supra.*

In the case of *In re Moerlein* (1988) Ind., 520 N.E.2d 1275, the Respondent was charged with, among other misconduct, engaging in conduct in violation of Disciplinary Rules 9–101(B) and 5–105(B), rules which, as the ones now before us, have no specific requirement that the Respondent acts "knowingly". There the Court found that the Respondent had sufficient information to be placed on notice that a conflict could reasonably be expected in his representing two different parties, and, thus, he was found to have violated Disciplinary Rules 5–105(B) and 9–101(B).

A scrutiny of the findings of fact in this case presents a picture far different from Respondent's interpretation of the evidence. The findings are uncontraverted that during Respondent's tenure funds which rightfully belonged to the State of Indiana and Delaware County were illegally transferred to Respondent's Branch account. The transfers were made by Willis to balance out the various accounts of the licence branch, including the Branch Manager's account from which Respondent's children and private legal secretary received unearned salaries and from which thousands of dollars were spent on Respondent's personal expenses. In 1982, the Branch Manager's account had some $97,730 in "cash advances" representing money which actually belonged to the State or County but which was transferred unlawfully into the account.

In his Grand Jury testimony the Respondent stated that he was aware that transfers were being made but was not aware that they were in violation of the law or procedures. At the end of 1981 the new State Board of Account procedures requiring strict accounting and timely deposits in the proper accounts were explained to the Respondent by his employees. In his letter of May, 1983, to Renner, the State Examiner, the Respondent stated that the improper transfers were necessary in order to pay employees and cover operating expenses. There is testimony that Judith Goes advised the Respondent of the existence of another account, the interest bearing account established by Willis, and that said interest was included as income on Respondent's personal income tax return.

In light of these findings, it is inconceivable how the Respondent could have remained so innocently ignorant of the source of funds used to balance his often overdrawn Branch Manager's Account. It is equally inconceivable that a licensed attorney would not know that the transfer of funds rightfully belonging to the State and County into an account often used for personal expenses is improper or illegal. The foregoing findings set forth clear and convincing evidence that the Respondent had every indication and was in fact aware that State and County funds were being illegally transferred into his account and often used for personal purposes. The findings further establish that the Respondent had sufficient indication that funds were being

diverted illegally by Willis into an account bearing Respondent's name.

Counts X through XIII charge that the Respondent, by paying salaries to his three children and private legal secretary from branch funds, engaged in illegal conduct involving moral turpitude, conduct involving dishonesty, fraud, deceit or misrepresentation, conduct that is prejudicial to the administration of justice, and conduct that adversely reflects on his fitness to practice law, all in violation of Disciplinary Rules 1–102(A)(3), (4) and (5). The Respondent does not deny the findings but challenges the conclusion that he engaged in illegal conduct or that his conduct reflects on his fitness as a lawyer.

The illegal conduct, "ghost employment," is set forth in I.C. 35–44–2–4 which makes it a Class D felony for a public servant to knowingly or intentionally hire an employee for the governmental entity that he serves and fails to assign any duties or assigns duties not related to the operation of the governmental entity. The Respondent denies that his actions violated this statute.

It is his contention that implicit in the violation of the foregoing statute is the requirement that the ghost employees be paid from public funds. Since the Branch Manager's Account was his to do with as he pleased, the Respondent now argues that it was not a public account. Although he cites no supporting authority for his opinion, the Respondent further contends that he did not view himself as a State employee but as an independent contractor. The remainder of his argument is an assertion that his conduct is not a proper subject for disciplinary action under Disciplinary Rules 1–102(A)(4), (5) or (6).

█ Respondent's argument is misdirected as it hinges on the contention that there is insufficient proof to find him guilty of a crime. A disciplinary action is not a criminal proceeding; the discipline of a member of the Bar of this State is independently determined from any other proceeding, even if the alleged professional impropriety involves criminal conduct. *In re McDaniel* (1984), Ind., 470 N.E.2d 1327. The ultimate question before this Court is whether the respondent engaged in the alleged conduct and whether there is a nexus between his acts of misconduct and his fitness to practice law. *In re Jones*, (1987), Ind., 515 N.E.2d 855. *In re Oliver*, (1986), Ind., 493 N.E.2d 1237. In that the Respondent is also charged with engaging in illegal conduct involving moral turpitude, we must further examine whether his conduct was illegal and whether the alleged illegal acts involve moral turpitude. In order to resolve the latter issue we must examine a particular course of conduct in toto. *In re Jones, supra, In re Oliver, supra, In re Thomas* (1985), Ind., 472 N.E.2d 609.

█ The unchallenged findings under these charges clearly establish that the Respondent paid his children and private legal secretary with funds derived from the Branch Manager's Account. Had all funds in Respondent's Branch account been properly earned for said account, the Respondent could have been entitled to them. However, the findings here establish that the Respondent was no more entitled to the portion of the funds which had been illegally transferred into his account than if said funds had been obtained through burglary of the local convenience store.

The Respondent was aware of the shortages in the Branch Manager's account, he knew that funds were being moved around to balance the accounts and yet, paid his own children and his private legal secretary salaries as Licence Branch Employees when, in fact, they had no assigned duties nor did they perform services for the Licence Branch. These persons were, in effect, paid through public funds which had been illegally transferred to the Branch Manager's Account. We must also note that had the Respondent been rightfully entitled to all of the funds paid to his children and secretary and had there been no shortages or illegal transfers, his paying these persons as employees when they performed no services, would have, nonetheless, perpetrated a falsehood on the public.

In the case of *In re McDaniel, supra,* this Court evaluated the conduct of a licence branch manager in the context of an

attorney disciplinary proceeding. The Respondent in said case had created a fictitious person and paid her a salary; he filed for a social security number, opened a bank account, filed income tax returns and endorsed the payroll checks of the fictitious person. He was found to have engaged in conduct involving dishonesty, deceit and misrepresentation and conduct which adversely reflects on his fitness to practice in violation of Disciplinary Rules 1–102(A)(4) and (6). The actions of the Respondent now before us are no less deceitful.

The Respondent urges this Court to accept his role in this entire incident as that of a poor manager and not as conduct which bears on his fitness as a lawyer. The findings suggest otherwise. Mishandling of funds by a lawyer, whether in a managerial or representative capacity, impacts on the essential fiduciary aspect of the legal profession and necessarily reflects on his suitability as a practitioner. We, thus, conclude under Counts II through VI and X through XIII, that the Respondent engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation, conduct that is prejudicial to the administration of justice and conduct that adversely reflects on his fitness to practice law in violation of Disciplinary Rules 1–102(A)(4), (5) and (6).

Upon an evaluation of Respondent's particular course of conduct, in toto, this Court finds that the evidence does not present sufficient basis for a conclusion that said misconduct raises to the level of illegal conduct involving moral turpitude.

Further, we concur with the Hearing Officer's assessment of the charges under Counts I, VII, VIII and IX and conclude that the evidence is insufficient to sustain a finding of misconduct.

Having determined that the Respondent engaged in professional misconduct, we must now assess an appropriate sanction. In doing so, this Court examines the nature of the incident, the specific acts of the Respondent, the impact on the public, this Court's responsibility to preserve the integrity of the Bar, and the risk, if any, to which the public will be submitted if the

Respondent is permitted to continue in the profession. *In re Moerlein, supra.* We see here before us a Respondent who for years spent thousands of dollars of public money with reckless disregard as to its rightful owner, the public. He closed his eyes and chose to ignore the theft and misappropriation being carried out in his name and for his benefit. It would be a travesty to tolerate the entrustment of private legal interests to a person who has so grossly breached the public trust. Accordingly, we conclude that the misconduct in this case warrants the strongest sanction available. It is, therefore, ordered that the Respondent, John V. Hampton, is hereby disbarred.

Costs of this proceeding are assessed against the Respondent.

SHEPARD, C.J., and DeBRULER, GIVAN and PIVARNIK, JJ., concur.

DICKSON, J., dissents and would impose a suspension for eighteen months.