**In the Matter of Arthur H. GEMMER.**

**No. 485 S 145.**

Supreme Court of Indiana.

Feb. 7, 1991.

Philip S. Kappes and David Hughes, Indianapolis, for respondent.

---

DISCIPLINARY ACTION

PER CURIAM.

This case is before us on a two count complaint for disciplinary action charging the Respondent, Arthur H. Gemmer, with violating the *Code of Professional Respon-*

*sibility for Attorneys at Law* (now superseded by the *Rules of Professional Conduct*). The Hearing Officer appointed pursuant to Admission and Discipline Rule 23 has tendered his findings of fact, conclusions of law and recommendations. The Respondent has challenged the Hearing Officer's report and has petitioned for review and oral argument. His petition for oral argument is hereby denied.

The review process employed in disciplinary cases entails a *de novo* examination of all matters presented. This includes a review not only of the Hearing Officer's report but also of the entire record tendered in the case. The Hearing Officer's findings receive emphasis due to the unique opportunity for direct observation of witnesses, but this Court makes the ultimate determination as to misconduct and sanction. *In re Kern* (1990), Ind., 555 N.E.2d 479; *In re Hampton* (1989), Ind., 533 N.E.2d 122. The issues raised in Respondent's petition for review will be resolved within the context of this review process.

Upon review of all matters tendered to this Court, we find under the charges of Count I that Donald Hall retained the Respondent on July 20, 1983, to represent Hall, Hall's wife, and Hall's two businesses, "Hall's Wheel Alignment and Brake Specialists, Inc." and "Hall's Automotive Repair Center." The Indiana Department of Revenue (Department) asserted that Hall and his wife and/or businesses owed in excess of $100,000 in sales and/or use taxes. Prior to contacting the Respondent, Hall had been advised by the Indiana Department of Revenue that his retail merchant's certificate would be revoked and not renewed unless the due taxes were paid in full. Such revocation would have effectively precluded Hall from doing business.

The Respondent required a retainer fee of $2,500 and agreed to accept payment in installments. By October 1, 1983, the Respondent received $2,300. The Respondent and Hall additionally agreed that Hall would repair Respondent's automobile, and that the value of such service would be credited as part of the payment of Respon-

dent's fees. By August 26, 1983, the Respondent received automobile repair services having a reasonable value of $1,011.71. During the course of the attorney-client relationship, the Respondent received payment and/or services having a total value of $3,311.71.

The Respondent was able to negotiate an agreement pursuant to which Hall paid $10,000 immediately, and, in return, the Department recalled the outstanding tax warrants which had been issued to the county sheriff. As part of the preliminary negotiations with the Department, the Respondent had agreed that he would report, no later than October 31, 1983, on his review of Hall's records as well as Hall's progress in raising sufficient funds to apply to tax payments.

On Respondent's recommendation, Hall authorized and the Respondent retained a certified public accountant to assist the Respondent in examining Hall's tax situation. Hall believed that his financial records would demonstrate misapplication of sales tax to items which were nontaxable or which were labor items. Hall turned over to the Respondent and the accountant a number of records. They included a group of cancelled checks approximately one to one and a half inches thick showing federal and state tax payments and numerous boxes containing financial records, particularly the monthly expenses for a three year period which was the subject of dispute with the Department. Among other things, the accountant was to examine the records from Hall's previous accountant and organize them into a computerized format for Respondent's use.

Approximately one week prior to a meeting with the Department which Hall believed was to take place, the Respondent informed Hall that the records did not support Hall's contention and that the Respondent could do nothing on Hall's behalf. Up until such announcement, Hall had not seen any work product produced by either the Respondent or the accountant and ultimately became convinced that his records had not been examined as they appeared to

have never been opened or moved from the accountant's car.

Having become dissatisfied with Respondent's lack of effort on his behalf, Hall, on October 11, 1983, wrote to Respondent advising that he will be retaining another attorney and that he will be in Respondent's office on October 13, 1983, to collect all of his records.

Prior to receiving Hall's letter, the Respondent, under an invoice of October 12, 1983, billed the Halls a total of $5,125.00. The bill incorrectly credited the Halls with paying only $1,300 and also incorrectly credited the value of the car repair services as only $849.30. It also contained a request for $2,648.75 as fees for the accountant.

Upon receipt of Hall's letter, the Respondent responded by letter stating:

"You, of course, have the right to change Attorney's (sic) at any time. However, as a condition precedent thereto, all of the fees of the first Attorney must be paid in full, and all files and records are retained until then."

"Therefore in response to your letter, I hereby advise you: (1) No ethical or competent Attorney will undertake to represent you, until he first determines that the prior Attorney has been paid in full; and the same is true as between a second Certified Public Accountant in regard to a prior C.P.A.; (2) I will retain your records in my possession until my fees, including those of the financial consultant are paid in full."

On several subsequent occasions Hall persisted in demanding the return of his business and personal records to no avail. The Respondent advised him in substance that if Hall did not pay Respondent, the records will not be returned and Hall's businesses would be closed.

Approximately twenty days after the Respondent had been advised that he was discharged from the case, he wrote a letter to the Department concerning Hall's case stating, among other things, as follows:

"I have advised you (by telephone this date), (i) that our examination of the client's records, fails to show any docu-

mentation for misinterpreting or misapplication of the sales tax ... the client has expressed a desire and intention to 'retain other counsel'."

"Since we are Attorneys of record with Powers of Attorney on file with your State Agency, we have a professional obligation to continue to represent the client to the best of our ability limited by his own records, until replaced ..."

The Respondent did not consult with or advise Hall of his intention to write this letter nor did he seek Hall's permission to do so.

On November 7, 1983, Hall's new attorney also wrote the Respondent requesting that he turn over Hall's files and advising the Respondent that delaying the return could cause serious damage to Hall. The Respondent replied stating, among other things, as follows:

"Before you can undertake to represent a client already represented by an Attorney, you have a professional responsibility to first determine that the prior Attorney has been paid ... proceeding without making such inquiry is a breach of professional ethics ..."

"I hereby make demand upon you to either (i) forward a certified check for the full amount of said fees ($5,624.39); or (ii) withdraw your filed Power of Attorney and withdraw from any representation of Mr. Hall ..."

"... if, upon my return, you have not remedied your ethical conduct, I will not hesitate to take appropriate action with the Disciplinary Commission."

Thereafter, the Respondent did file a grievance with the Disciplinary Commission against Hall's new attorney for having undertaken Hall's representation when the Respondent's bill had not been paid.

Hall ultimately recovered many of his records but he has never recovered the stack of cancelled checks which related directly to payments made to taxing authorities nor a number of boxes of monthly records. Hall needed these particular records in his dispute with the Indiana Department of Revenue and for an Internal Revenue Service (IRS) audit covering the same period of time. The Respondent was aware of the IRS audit and the importance of these records to Hall. Ultimately the IRS audit was completed without Hall being able to utilize his records.

On January 6, 1984, the Respondent filed documents entitled "Attorneys Equitable Lien Against Real Estate" against two properties. One was Hall's residence located in Greenwood, Indiana; the other was Hall's business property in Indianapolis which was being purchased by Hall on contract from Paul and Jane Baldwin. The lien was in the amount of $5,624.39. On February 10, 1984, the Respondent sent another bill to Hall, this time claiming a fee of $7,352.36. This bill included not only the previously claimed fee but also 12% interest, charges for letters to Hall and Hall's new attorney demanding payment of fees and refusing to return records, charges for a conference with the IRS advising that the "client had misrepresented to agent that I had his profit and loss statements" and charges of $965.57 for damages to Respondent's automobile due to breakdown while Respondent was on vacation. The Respondent further noted on this bill that "this does not include time, trouble, and expense necessary to rebut and refute baseless and false grievance filed by client with the Indiana State Bar Association."

Hall eventually received a discharge in bankruptcy which included Respondent's fee claims. When the Baldwins filed for foreclosure on the property being purchased by Hall on contract, they had to make the Respondent a party by virtue of the lien which he had filed. The Respondent then filed a cross-complaint against the Halls to foreclose both of the liens. In order to defend against Respondent's efforts, it was necessary for the Halls to obtain legal counsel. The Respondent knew or, at best, should have known that he was without any legitimate right to encumber the Halls' real estate.

In his petition for review the Respondent contends in his testimony that he never received any records from Hall should have been ample evidence for a finding stating the same. We find that there was over-

whelming evidence, including Respondent's own admissions in writing, that he intended to retain all records until paid, that he did receive Hall's personal records and deliberately refused to return them. Respondent's contention that he should have been allowed to introduce materials from unrelated litigation in the Marion County Superior Court and the United States Bankruptcy Court where the issue of return of records may have been raised is untenable. This Court has repeatedly held that the discipline of a member of the Bar of this State is independently determined from any other proceeding. *In re Kern, supra; In re Hampton, supra; In re McDaniel* (1984), Ind., 470 N.E.2d 1327; *In re Mann* (1979), 270 Ind. 358, 385 N.E.2d 1139; *In re Crumpacker* (1978), 269 Ind. 630, 383 N.E.2d 36, *cert. denied* 444 U.S. 979, 100 S.Ct. 481, 62 L.Ed.2d 406.

The Respondent also contends that by disclosing to the Indiana Department of Revenue, after he was discharged from the case, that his now former client did not have sufficient documents to support his position, the Respondent did not reveal a confidence but was acting under a duty to preserve the "status quo" because replacement counsel had not been named. This contorted interpretation of what in fact occurred does not warrant deliberation, and, suffice it to say, is without any merit.

On the issue of whether or not Respondent violated professional ethics by filing the above described lien, the Respondent argues that he had a colorable right to file such a lien, that exclusive jurisdiction to determine the validity of an equitable lien in the "County Court" where such lien was recorded, and that a default judgment granted for Respondent in another proceeding is *res judicata* in this case. This contention is not supported by authority. *Id.* Some of the very case authority cited in Respondent's brief (*State ex rel. McNabb v. Allen Superior Court,* (1947) 225 Ind. 402, 75 N.E.2d 788), by omission, excludes the sort of equitable real estate lien Respondent attempted to secure.

This Court is fully convinced that the evidence amply supports the foregoing findings of fact and that such findings clearly establish that by failing to return Hall's records, the Respondent violated D.R. 9–102(B)(4); he intentionally revealed Hall's confidence, thereby violating D.R. 4–101(B)(1); he knowingly advanced a claim that is unwarranted under existing law, thereby violating D.R. 7–102(A)(2); and he engaged in conduct which is prejudicial to the administration of justice and which reflects adversely on Respondent's fitness to practice law, in violation of D.R. 1–102(A)(5) and (6) of the *Code of Professional Responsibility for Attorneys at Law.*

There is little disagreement as to the facts presented under Count II. In the spring of 1982, the Respondent and his wife arranged and contracted for the reception of their daughter's wedding to be held at the Garden on the Green restaurant located on the grounds of the Indianapolis Museum of Art. The bill for services was to be paid at the conclusion of the reception. Garden On The Green is the assumed business name by which the restaurant was operated by Party Planners, Inc., a fact not known to the Respondent or his wife.

As planned, the wedding reception took place on May 22, 1982, at the Garden On The Green which provided food and beverage services. At the conclusion, the co-owners of the restaurant presented a bill for $3,543.03 to the Respondent and his wife and reviewed all the details. The Respondent did not offer any complaint that the bill was excessive, incorrect or that he was reluctant to pay it. He simply indicated that he had not brought his checkbook with him and would return the following day to pay the bill.

When the Respondent did not return the following day as promised, a co-owner of the restaurant attempted to contact him. The Respondent would not come to the phone and refused permission for a representative of the restaurant to come to his home to collect the bill. He failed to respond to a variety of requests for payment, but at no time did he object to the bill, the amount or the services rendered by the restaurant.

Ultimately the restaurant retained counsel and filed suit against the Respondent and his wife. The Respondent first asked for a sixty day extension to respond and later filed a motion pursuant to T.R. 12(B)(6) contending that "Garden on the Green" named as plaintiff in the complaint did not have capacity to sue and was not a real party in interest under T.R. 17(A). The trial court granted the plaintiff's motion to amend its complaint so that the plaintiff became Party Planners, Inc., d/b/a Garden on the Green. The court also directed Respondent to answer or respond within twenty days. Instead of responding, the Respondent filed a motion requesting the court to strike the Amended Complaint asserting now that the corporation was not a proper party to the case and therefore could not file the Amended Complaint.

The Plaintiffs filed a Motion for Summary Judgment. Although the Respondent was notified, he failed to appear at the hearing on said motion. The trial court granted summary judgment for $3,543.03 together with interest from May 22, 1982, and costs. On August 12, 1983, the Respondent filed a T.R. 60(B) Motion for Relief From Void Summary Judgment and Hearing which was dismissed by the court.

From August 12, 1983, until December 20, 1984, the Respondent filed some twenty-five pleadings calculated to delay the collection of Plaintiff's judgment. The Respondent made two separate attempts to remove the trial judge from the case pursuant to T.R. 53.1 which this Court denied. Each action by this Court was followed by repetitive motions to reconsider which were also overruled.

On April 5, 1984, the Respondent filed a counter-claim for $7,600 in damages for malicious abuse of process against the Plaintiffs. The counter-claim additionally sought assessment of attorney fees and exemplary damages for a total of $20,000 in damages. The allegations of this counter-claim were verified by the Respondent.

Thereafter the Respondent filed amended counter-claim, this time seeking $52,000, and a document entitled "Additional Counter Claim in Proceedings Supplemental" seeking $7,500. Both of these pleadings were verified by the Respondent.

As a result of Respondent's actions, Party Planners, Inc., was obligated to employ counsel both to pursue payment of its bill and to defend against Respondent's counter-claims. Party Planners paid in excess of $4,200 for such representation.

The complaint charges that by the above described conduct the Respondent filed a suit, asserted a position, and delayed a trial on behalf of a client when he knew or when it was obvious that such action would serve merely to harass or maliciously injure another, thereby violating D.R. 7–102(A)(1) and D.R. 1–102(A)(5) and (6) of the *Code*.

■ In response to this Count, the Respondent argues that he was not representing a client but acting *pro se* and, thus, could not have violated D.R. 7–102(A)(1). This assertion is simply not supported by fact or law. The Respondent was representing not only himself but his wife. Additionally, the Disciplinary Rules set out under the *Code of Professional Responsibility* and the present superseding *Rules of Professional Conduct* establish minimum standards of ethics and competence for all attorneys. Such rules do not permit an attorney to engage in unethical or obstreperous conduct simply because he is acting on his own behalf. This Court has previously found that attorneys engaged in *pro se* litigation are held to the same standards, and actions designed or instituted to intimidate, harass, and impede the opposition are in violation of D.R. 7–102(A)(1) and D.R. 1–102(A)(5) and (6). *See In re Budnick* (1984), Ind., 466 N.E.2d 36; *In re Friedland* (1981), Ind., 416 N.E.2d 433.

Respondent further contends that he was merely pursuing his lawful remedies. In support of this contention he seems to argue that it was "bizarre" that the trial court allowed Garden on the Green to amend its complaint rather than file a whole new lawsuit. Such argument is incredible in light of Trial Rules 15 and 17 of the Rules of Trial Procedure.

In light of the foregoing findings and considerations, we conclude that the Respondent engaged in misconduct as charged.

Having so concluded, this Court must now assess an appropriate disciplinary sanction. This involves an examination of the nature of the violation, the specific acts of the Respondent, this Court's responsibility to preserve the integrity of the Bar, and the risk to which the public will be subjected if the Respondent is permitted to continue in the profession. *In re Kern, supra; In re Olsen* (1989), Ind., 547 N.E.2d 849; *In re Hampton, supra.*

Respondent's acts are appalling. He vindictively disclosed his clients' confidences, held their records "hostage," clouded their property without any legal basis, and caused them extensive pains and expenses. We can conjure up no other motivation than revenge for being dismissed from a case for which Respondent did little to earn his claimed fee. In the second instance, the Respondent simply avoided paying a just bill, once again using his legal skills to retaliate, harass and damage the plaintiffs. His conduct is beyond a mere violation of the Code; it is willful refusal to admit even the slightest error. Unfortunately, Respondent's brief has the same tenor as Respondent's behavior.

The Preamble to the *Code of Professional Responsibility* advises that a lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. Respondent's actions in both of these matters reveal the opposite. To accept such conduct as merely zealous advocacy by a skilled attorney, as Respondent seems to argue, would make a mockery of the *Rules of Professional Conduct.* Respondent's conduct has not only caused damage to others but has impugned the integrity of the legal profession. In light of the nature of the violation and the specific acts of the Respondent, this Court concludes that a lengthy period of suspension is warranted.

It is, therefore, ordered that the Respondent is suspended from the practice of law for a period of three (3) years beginning March 8, 1991. It is further ordered that Respondent's efforts at voluntary restitution shall be a matter to be considered in any subsequent proceedings for reinstatement.

Costs of this proceeding are assessed against Respondent.