**In the Matter of Alphaeus S. WOOLBERT.**

**No. 48S00–9503–DI–283.**

Supreme Court of Indiana.

Nov. 7, 1996.

Addendum to Order Nov. 15, 1996.

Alphaeus S. Woolbert, Anderson, William G. Bruns, Muncie, for Respondent.

Donald R. Lundberg, Executive Secretary, Robert C. Shook, Staff Attorney, Indianapolis, for Indiana Supreme Court Disciplinary Commission.

PER CURIAM.

The Indiana Supreme Court Disciplinary Commission charged Alphaeus S. Woolbert in a single count complaint for disciplinary action with professional misconduct arising out of his handling an estate. Specifically, he was charged with failing to hold the client's property separate from his own, knowingly disobeying an obligation under the

rules of a tribunal, committing a criminal act that reflects adversely on his fitness as a lawyer, engaging in conduct involving dishonesty, fraud, deceit or misrepresentation, and engaging in conduct which is prejudicial to the administration of justice. A hearing officer appointed by this Court pursuant to *Admission and Discipline Rule 23* held an evidentiary hearing and tendered his Findings of Fact to this Court. Both parties petitioned for review, and the case is now before us for final adjudication. This Court's review of disciplinary cases is *de novo* in nature and involves a consideration of the entire record submitted in the case. In this process, the Hearing Officer's report receives emphasis, but this Court remains the final arbiter of disputed facts and ultimately determines all factual and legal conclusions. *Matter of Moore,* 665 N.E.2d 40 (Ind., 1996); *Matter of Robak,* 654 N.E.2d 731 (Ind., 1995); *Matter of Gemmer,* 566 N.E.2d 528 (Ind., 1991).

The respondent is a member of the bar of this state, having been admitted to the practice of law in 1950.. On June 17, 1985, the respondent filed a petition for probate of the estate of James Lawrence Williams. The respondent and Roland Gene Roller were named co-executors, and the respondent became the attorney for the co-executors. The estate was opened as a supervised estate. The estate was not small or simple, and the respondent spent time dealing with a wrongful death claim and getting the inheritance tax reduced.

Beginning on August 7, 1985, (less than two months after the estate was opened) and until the filing of an Inventory, Appraisement and Report of Co–Executors on February 17, 1989, the respondent and Roller withdrew $80,000 from the estate. The respondent neither sought nor received approval from the court for these withdrawals. Of that amount, the respondent received $35,000, and Roller received $35,000. The remaining $10,000 was directed to Hugh P. and Linda Grider or a business enterprise, Carriage House, as loans.

At the inception of this estate administration, the co-executors had established a joint checking account requiring both signatures. Each time a check was issued to the respondent, a check for the exact amount was issued to Roller. The checks were co-signed by the co-executors. On April 13, 1989, the co-executors filed their accounting. In June of 1989, the heirs petitioned to have the respondent and Roller removed as co-executors. The court granted the petition on August 27, 1990, effective immediately, with instructions that the former co-executors submit final accounting by November 16, 1990. The court did not accept the final report originally submitted by the respondent and Roller and ordered them to submit a corrected final report. On August 23, 1991, the respondent filed the final report. The respondent did not petition for approval of the withdrawals from the estate until August 23, 1991.

On July 20, 1992, the trial court entered an order finding, *inter alia,* that all final accounts were neither in form nor content as required by I.C. 29–1–16–4, did not balance, and were paid without any petition or order from the court. The court ordered the amount of fees taken by the respondent and Roller reduced to $14,500 for the respondent and $3,800 for Roller. The court found that the loans to the third parties were improper and ordered them repaid, and also ordered that the co-executors refund certain additional moneys representing losses to the estate due to the handling by the co-executors. The recovery was reduced to a judgment against the co-executors for which each was jointly and severally liable. Eventually, Roller received relief in bankruptcy.

The respondent's version of events in the administration of this estate is that he and Roller had agreed that Roller would handle the estate assets. The respondent claimed he signed checks in blank and left the checkbook with Roller. Although the bank statements were sent to the respondent, he claimed that he forwarded them to Roller without opening them. The respondent claimed that he estimated "generally" the requested withdrawals and that the $35,000 he received in the form of checks co-signed by him and Roller was for his professional services rendered to the estate. Further, the respondent claimed that he did not know that Roller was issuing checks to himself for

amounts equal to the fees withdrawn by the respondent or that Roller was loaning estate funds to others. The respondent also claimed that he first became aware of the loans to third parties in the Fall of 1989 and felt that the recipients of these loans should sign notes. Yet, he did not immediately bring this to the attention of the trial court. Promissory notes for these loans were not signed until April 12, 1991, in the Jay County Courthouse prior to a hearing on objections made to the final account submitted by the respondent and Roller. Roller's version was somewhat different. He testified that he reviewed the estate checks with the respondent every six to eight months and that he did this on four or five occasions.

The respondent admits to some neglect but denies any more serious culpability. The respondent's position is based on the premise he did not have to seek court approval for withdrawing fees from this supervised estate. This argument is unpersuasive. Indiana Code 29–1–10–13 provides, among other things, that:

> An attorney performing services for the estate at the instance of the personal representative shall have such compensation therefor out of the estate as the court shall deem just and reasonable. Such compensation may be allowed at the final settlement; but at any time during administration a personal representative or his attorney may apply to the court for an allowance upon the compensation of the personal representative and upon attorney's fees.

■ The statute is clear that fees may be allowed at final settlement, but at any time during the administration of an estate, the attorney may apply to the court for compensation. The practice in Jay County was consistent with this law. The Jay Circuit Court had not specifically implemented this statute through the promulgation of a local rule. That fact, however, in no way diminished the applicability of the statutory provision to this probate proceeding. The duty to comply with statutory rules applicable to trial court proceedings is no less than the duty to comply with specific local rules. It is undisputed that the respondent did not seek approval of

nor did he disclose the withdrawal of funds from the estate for a considerable period of time. Upon review of the accounting, the trial court found that the amounts withdrawn by him and Roller were not only unauthorized but also excessive.

■ The respondent's disclaimer regarding the activities of the co-executor is equally unpersuasive, and his actions are inconsistent with this contention. In the past, this court has evaluated the specific *scienter* element of a disciplinary charge and has analogized the same to the definition of "knowingly" within the criminal law context. *Matter of Price*, 429 N.E.2d 961 (Ind., 1982). The *Preamble* to the *Rules of Professional Conduct* defines "knowingly," "known," or "knows" as denoting actual knowledge of the fact in question, but that a person's knowledge may be inferred from circumstances. Although the rules of professional conduct under which the respondent is charged are not specifically confined to knowing actions, we look to this analogy for guidance in evaluating the mental state of the respondent during the course of this conduct. The respondent became aware in the Fall of 1989 that something was amiss with his co-executor Roller's handling of the finances of the estate but did not bring this to the attention of the court. While claiming total abdication over the control of the financial aspects of the estate, the respondent claimed fees for at least 152.5 hours for 44 meetings with Roller from the time the estate was opened until the end of 1989. Further, the respondent expended time resisting the attempt by the heirs to remove the co-executors and charged that time to the estate, indicating acquiescence with the co-executor's actions. Also, he was aware in the Fall of 1989 that loans had been made from estate funds but did not so advise the court until May 4, 1990, when the final report of the co-executors was filed. The hearing officer found that the respondent should have known what was going on and that he hid the misfeasance of Roller from the court. The hearing officer's assessment of the evidence and his judgment in reconciling conflicting testimony and evidence carries great weight. Accordingly, we give deference to his judgment. *See Matter of Sheaffer*, 655 N.E.2d

1214, at 1218 (Ind., 1995); *Matter of Kern,* 555 N.E.2d 479, at 482 (Ind., 1990).

The findings before us establish conduct far more culpable than mere negligence. As an attorney and executor of the estate, the respondent entered into a fiduciary relationship which placed him in a special position of obligation and responsibility. Pleading ignorance of the very mechanics of the job for which he was hired is inconsistent with the essence of his fiduciary position. Traditionally, this Court has held attorneys in a fiduciary relationship to a high standard, and transactions during the confidential relationship have been closely scrutinized by this Court and have been regarded with suspicion. *See Matter of Good,* 632 N.E.2d 719, at 721 (Ind.,1994); *Matter of Smith,* 572 N.E.2d 1280, at 1285 (Ind., 1991). In this instance, the respondent acted, at best, with gross disregard for his fiduciary duty.

 We, thus, conclude from the foregoing findings that the respondent withdrew estate funds without court authorization as required by state law, exercised unauthorized control over these funds for a period of time, and, during that time, failed to hold these funds separate from his own. By so doing the respondent violated *Prof.Cond.Rules 1.15(a)* [1] *and 3.4(c)* [2]. Such unauthorized control constitutes criminal conversion and is clearly prohibited by I.C. 35–43–4–3. It reflects adversely on the respondent's honesty, trustworthiness and fitness as a lawyer and is violative of *Prof.Cond.R. 8.4(b)*. [3] Further, this conduct involves dishonesty and misrepresentation, in violation of *Prof.Cond.R. 8.4(c)*. [4] By these actions and his gross disregard of his fiduciary duties, the respondent engaged in conduct prejudicial to the administration of justice in violation of *Prof. Cond.R. 8.4(d)* [5].

 Having determined that the respondent engaged in professional misconduct, we must now assess the appropriate disciplinary sanction. In such analysis, we consider the nature of the misconduct, the duty violated, the lawyer's mental state, the actual or potential injury caused by the misconduct, the duty of this court to preserve the integrity of the profession, the potential risk to the public in permitting the respondent to continue in the profession, and the existence of aggravating or mitigating circumstances. *Matter of Woods,* 660 N.E.2d 340 (Ind., 1996); *Matter of Drozda,* 653 N.E.2d 991 (Ind., 1995); *Matter of Cawley,* 602 N.E.2d 1022 (Ind., 1992). We note further that the respondent has suffered from several serious physical afflictions starting in 1988, although there is no evidence that a relationship existed between the respondent's physical problems and his conduct in this case. We note further that the respondent was suspended for a period of ninety days during 1995 for professional misconduct. *Matter of Woolbert,* 648 N.E.2d 1152 (Ind., 1995). Prior disciplinary offenses are aggravating factors which we consider in deciding what sanction to impose. *Matter of Woods, Supra; Standard 9.0, American Bar Association Standards for Imposing Lawyer Sanctions.* Respondent's prior discipline and the degree of culpability occasioning this misconduct, lead us to conclude that a one year period of suspension without automatic reinstatement is appropriate. It assures us that the respondent must prove that he is fit to be readmitted to the bar and that he will have an opportunity to do so in not too distant a future. This sanction is consistent with

---

1. *Prof.Cond.R. 1.15(a)* provides, *inter alia,* that a lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

2. *Prof.Cond.R. 3.4(c)* provides that a lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.

3. *Prof.Cond.R. 8.4(b)* provides that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

4. *Prof.Cond.R. 8.4(c)* provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

5. *Prof.Cond.R. 8.4(d)* provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

*Standard 4.12* of the model *American Bar Association Standards for Imposing Lawyer Sanctions,* which provides that suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client. The Commentary to *Standard 2.3* of said model standards further elaborates that short-term suspensions with automatic reinstatement are not an effective means of protecting the public and that it is preferable to suspend a lawyer for a more lengthy period in order to insure effective demonstration of rehabilitation.

Accordingly, the respondent, Alphaeus S. Woolbert, is suspended from the practice of law for a period of one (1) year, at the conclusion of which he shall be eligible to petition for reinstatement pursuant to *Admission and Discipline Rule 23.*

Costs of this proceeding are assessed against the respondent.

## ADDENDUM TO *PER CURIAM* ORDER IMPOSING ONE YEAR SUSPENSION

On November 7, 1996, this Court issued a *per curiam* Order suspending the respondent, Alphaeus S. Woolbert, from the practice of law for a period of one (1) year, at the conclusion of which the respondent shall be eligible to petition this Court for reinstatement to the practice of law.

And this Court now finds that the effective date of the respondent's suspension from the practice of law should be December 20, 1996.

IT IS, THEREFORE, ORDERED that the one (1) year suspension from the practice of law imposed by this Court on the respondent, Alphaeus S. Woolbert, by *per curiam* Order issued November 7, 1996, shall begin on December 20, 1996. This Court's *per curiam* Order shall otherwise remain in full force and effect.

The Clerk of this Court is directed to forward notice of this Order to all parties of record and to all other entities as directed in Ind.Admission and Discipline Rule 23, Section 3(d), governing disbarment and suspension.