(No. 67738.—)

*In re* RICHARD CORNELL IMMING, Attorney,
Respondent.

*Opinion filed September 27, 1989.*

Deborah M. Kennedy, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Sidney Z. Karasik, of Chicago, for respondent.

JUSTICE STAMOS delivered the opinion of the court:

On January 24, 1986, the Administrator of the Attorney Registration and Disciplinary Commission filed a four-count complaint charging attorney-respondent Richard Cornell Imming with engaging in prohibited business transactions with clients, accepting employment when his professional judgment may be affected by his own interests, engaging in conduct prejudicial to the administration of justice, causing prejudice or damage to his clients and overreaching in his attorney-client rela-

tionships in violation of several provisions of the Code of Professional Responsibility (the Code) (107 Ill. 2d R. 1– 101 *et seq.*).

On July 27, 1987, the Hearing Board issued a report finding that the Administrator had proved the misconduct alleged in the complaint and recommended that the respondent be disbarred. The respondent filed exceptions to the report and recommendation on October 5, 1987. In an order dated November 16, 1988, the Review Board affirmed the findings and conclusions of the Hearing Board, but recommended that respondent be suspended from the practice of law for a period of two years. The Administrator and respondent both filed exceptions to the report and recommendation of the Review Board. 107 Ill. 2d R. 753(e).

## BACKGROUND

### A. Respondent and Polypropylene Films, Inc.

Respondent was admitted to practice law in Illinois in 1963. Respondent concentrated his legal practice in real estate, estate planning and finance for corporate clients. Beginning in 1971, respondent began involvement in a plastic manufacturing company. Due to respondent's increased activity in the business world, he reduced the size of his law practice.

In 1977, respondent formed his own plastic manufacturing firm known as Polypropylene Films, Inc. (PFI). Respondent was the president and sole shareholder of PFI, and obtained the initial financing for the business by borrowing $400,000, obtaining a $75,000 mortgage on his home and liquidating certain personal assets. However, PFI had difficulty meeting its expenses. From 1977 through 1981, the respondent obtained funds by arranging for loans from several of his legal clients. These loans were evidenced by unsecured promissory notes is-

sued by PFI with an annual interest rate of 12% or 15% annually. Respondent also personally guaranteed the repayment of these loans.

PFI never earned a profit. The corporation's income tax returns for 1978 and 1979 show a negative taxable income of $642,696 and $859,000. PFI did not file a tax return for 1980 because there was no taxable income to report and the corporation could not afford to pay its tax accountants. Respondent never advised his client/creditors of PFI's negative taxable income. He also did not make accurate financial statements or balance sheets available for public review. Respondent did supply PFI's suppliers with documents containing certain financial projections, but he testified that he never allowed his clients to view them because he believed the information might have misled them.

During 1978 and 1979, respondent paid the daily operating expenses of PFI with the funds he borrowed from his clients. Sometime in 1979 or 1980, the corporation began to suffer severe financial difficulties due to the rising costs of materials and respondent's inability to obtain these materials on credit. Thus, PFI was unable to meet its obligations to pay monthly interest installments on the loans from respondent's clients.

During the summer of 1980, respondent sent several written communications to his client/creditors, purportedly to explain the interruption of the interest payments. The first communication, a form letter, blamed the situation on "general economic conditions," but failed to mention respondent's credit problems. In July of 1980, respondent targeted a second letter to client/creditors with substantial cash assets, suggesting that each client/creditor could assist PFI in raising additional capital by purchasing common stock in PFI, and that any additional investment would help ensure PFI's repayment of the debt owed the client. Shortly thereafter, respondent

sent a third communication stating that PFI would resume interest payments in 30 days because July sales "were good" and "August should be good or better."

As of January 1981, PFI had made no additional interest payments. At this time, respondent devised a plan which would make PFI "attractive to a major investor." Respondent intended to reassign all the promissory notes from PFI to himself as payor of the obligation, while issuing preferred stock to himself as payment for assuming the notes. In effect, this would make it appear, on the face of corporate records, that PFI had no debt. This plan never came to fruition, however, as no new investors came forward. Despite this, respondent sent a final letter to the client/creditors on October 19, 1981, stating that he expected PFI to be sold on October 31, 1981. This sale also did not materialize. Neither PFI nor the respondent ever resumed interest payments.

By 1982, PFI had ceased to function. On March 11, 1983, respondent filed a petition in the United States Bankruptcy Court for the Northern District of Illinois seeking protection under chapter 13 of the Bankruptcy Code. (*In re* Imming (N.D. Ill., filed Mar. 11, 1983), No. 83—B—3308.) Only client/creditors who had initiated formal actions against respondent were scheduled as creditors. Respondent did not disclose those clients who had not initiated any formal action.

During the time when respondent was in contact with his client/creditors, from 1977 through 1981, respondent never advised any of them to seek the advice of other counsel. He also failed to disclose the financial status of either PFI or himself. During 1981, when respondent reassigned the promissory notes making himself the obligor on the debts, he failed to disclose any of the details surrounding PFI's operating problems.

B. Respondent's Relations with Client/Creditors

The Hearing Board focused on respondent's relationships with eight of his clients, each of whom loaned PFI large sums of money. To better understand the parameters of respondent's misconduct, we will examine the facts of each client's situation:

(1) Jacqueline Silvertsen Chesbrough retained respondent to represent her as executor of her deceased husband's will in 1970. Between 1970 and 1973, respondent also represented Chesbrough in matters involving claims against the estate, including a lawsuit by her husband's former business partners where settlement proceeds were distributed as late as 1986.

In 1978, Chesbrough, on the recommendation of her second husband, businessman Clayton Silvertsen, loaned PFI $25,000. The promissory note contained respondent's personal guarantee of repayment with 12% interest, payable monthly. The Hearing Board determined that Chesbrough was "not a person experienced in business matters." She received interest payments on the loan until November 1981, but has not received repayment of the principal.

(2) Mary Eichler retained respondent to prepare wills for herself and her husband and to represent her as executor of her husband's will in 1976. Respondent also represented her in a real estate sale in 1978. Eichler also routinely consulted respondent for advice regarding matters she "did not understand." Between July 1978 and May 1979, Eichler made three loans to PFI totaling $40,000. The funds for these loans came partially from the 1978 real estate sale. Eichler stated that at the time the loans were made, respondent did not disclose anything regarding the risk of making the loans, any possible conflicts of interest, or any details of his own financial status. She also stated that at the time she made the

loans, she believed respondent was her attorney and that he was acting in a way so as to protect her interests.

Eichler has received no interest payments since July 1980, and has not received repayment of the principal. In November and December 1981, respondent tendered two checks to Eichler in payment for interest due in each of those months. Each check, however, was returned by respondent's bank because they were drawn on closed accounts.

(3) In June 1978, Sharon Westphal-Hix (Westphal) retained respondent to handle matters surrounding the death of her first husband. At that time, Westphal was struggling to support two minor children on a meager fixed monthly income. In July 1978, as respondent was winding up the Hix estate, he suggested that Westphal could earn additional income by investing in PFI. Westphal loaned PFI $15,000 and received a promissory note similar to the ones given to Eichler and Chesbrough. Westphal testified that at the time of that loan she believed respondent was functioning as her attorney and that he was acting to protect her interests through giving her investment advice. Respondent, however, did not disclose any information regarding PFI's financial condition, any potential conflict of interest, or any of the risks involved in investing in PFI.

Between July 1978 and March 1979, respondent represented Westphal in two real estate transactions. At respondent's suggestion, Westphal loaned an additional $15,000 to PFI. In October 1980, PFI ceased making interest payments to Westphal. She then contacted respondent, demanding the entire amount due. Respondent informed Westphal that he would be unable to repay her. Westphal, however, continued to regularly contact respondent until she received $20,000, representing a portion of the obligation owed her.

(4) From 1979 through 1981, respondent represented Harvey Daeumer and his wife in selling their interests in a business, purchasing a condominium, preparing their wills, and in a dispute with the City of Elgin over storm sewer assessments. In March 1979, respondent mailed Daeumer and his wife a letter suggesting they invest in PFI. Shortly thereafter, Daeumer discussed a potential loan to PFI with respondent. Daeumer was given an opportunity to tour the PFI corporate facility, but was never advised of the respondent's personal financial condition, of respondent's interest in the company, or that respondent was the sole owner of the company. In April 1979, Daeumer loaned $50,000 to PFI. As in the cases of the clients already discussed, Daeumer received a promissory note. When interest payments became delinquent in 1980, Daeumer contacted respondent. Respondent then explained PFI's financial and credit problems.

Daeumer testified that, at the time he loaned PFI the money, he viewed respondent as his attorney. Daeumer continued to utilize respondent's legal services during the relevant time period. Daeumer has also never retained another attorney except to bring action against the respondent for the delinquent loan payments.

Daeumer has not received payment on the principal of the loan. He also has not received payment of the outstanding interest due. He did, however, receive a check from the respondent for payment of interest for November 1981, but the check was dishonored by respondent's bank for being drawn on a closed account.

(5) Madeline Hillquist retained respondent in 1979 to represent her in the sale of her deceased husband's business. Thereafter, respondent also represented Hillquist in purchasing real estate and preparing a will. Hillquist's only sources of income at that time were social security payments and the proceeds from the sale of the business.

In June 1979, Hillquist loaned PFI $40,000 from the proceeds of the sale of the business. At that time respondent also represented Hillquist's daughter and son-in-law, the Volmers, in real estate dealings and estate planning. Following Hillquist's loan to PFI, the Volmers also became interested in investing, eventually loaning PFI $14,000 in March 1980. Both loans were evidenced by promissory notes.

During the course of their discussions with the respondent, neither Hillquist nor the Volmers were aware of PFI's assets or of respondent's net worth. Mr. Volmer testified that, while he knew that respondent was running the daily operations of PFI, he was unaware of how much respondent had invested in the corporation. He also stated that, due to his inexperience in business matters, he felt he could rely on respondent's advice as an attorney in making the loans.

In June 1981, the Volmers and Hillquist received replacement promissory notes listing respondent as the obligor instead of PFI. Respondent failed to discuss any differences that might exist between these and the original notes. As in the case of the other clients, respondent failed to keep up with the interest payments. In March 1983, all three lenders instituted formal proceedings against respondent. A settlement was reached for approximately two-thirds of respondent's obligation.

(6) In 1977, respondent represented William Volkening in the sale of real estate. The proceeds from that sale exceeded $1 million. While discussing the conclusion of this sale and the collection of the fee for his services, respondent described PFI to Volkening. At that time, Volkening loaned $100,000 to PFI. Respondent issued a promissory note to Volkening in evidence of the debt.

Volkening died in 1979, leaving an estate in excess of $2 million. He named Irene Werner, his housekeeper and companion of 40 years, as executor of his will. After

Volkening's funeral, Werner requested that respondent assist her in handling the estate.

Prior to his relationship with Werner, Volkening had married another woman. Since 1939, however, he had not resided with his wife. The marriage had never been dissolved. In order to avoid claims by the legal widow, respondent reissued the promissory note for the $100,000 loan, but named Werner as payee instead of Volkening.

In November 1979, respondent advised Werner that if she loaned additional money to PFI it would increase the corporation's chances of repaying the original $100,000 obligation. In response, Werner loaned PFI an additional $50,000 in exchange for a second promissory note. This second loan was secured by all the legal fees due to the law firm of Imming, Faber & Roeser from Volkening's estate.

Respondent ceased interest payments in 1980. Shortly thereafter, Werner retained other counsel and instituted formal action against respondent. Respondent's former law partners settled with Werner by paying her $50,000. However, she has not received any of the $100,000 loan. Werner also testified that prior to Volkening's death, she had no business or management experience. Respondent had never disclosed the risks to Werner, and she considered respondent to be her attorney.

(7) Prior to retiring, Carl Eckholm was president and general manager of Williams Manufacturing Company. In 1979, respondent represented Eckholm in the sale of his home and the drafting of wills for his family. At that time, respondent approached Eckholm for a loan. They discussed the employees of PFI and how PFI was patterned after another successful company called Copolyex. Respondent assured Eckholm that PFI was a well-backed venture. Respondent said nothing, however, regarding the

financial status of PFI, his own financial status, or any risks involved in the investment. Eckholm loaned PFI $20,000. A few months later, respondent issued Eckholm a check for interest which was dishonored. After explaining PFI's financial problems to Eckholm, respondent reassigned the promissory note, changing the obligor from PFI to respondent himself. Since that time, however, Eckholm has not received any interest payments or collected any of the principal.

(8) During the time period relevant to the case at bar, respondent served as attorney for Starro Precision Products, Inc. (Starro), a company owned by Bruce Stark, Sr., and Bruce Stark, Jr. Respondent also served as a director and trustee of Starro's employee pension plan, which he prepared for the company.

In April 1981, the pension fund loaned PFI $20,000, evidenced by a promissory note which respondent personally guaranteed. The Starks had the opportunity to tour PFI's facilities and were aware of respondent's investment and personal involvement in PFI. However, respondent never suggested that there might be any limitations on the pension fund's loaning him money and he never disclosed PFI's or his own financial status.

## ANALYSIS

This court has clearly established the principles governing our review of the reports and recommendations of both the Hearing Board and the Review Board. The Administrator bears the burden of proving, by clear and convincing evidence, that respondent engaged in the misconduct with which he is charged. (107 Ill. 2d R. 753(c)(6).) The Hearing Board's findings of fact are entitled to virtually the same weight as the findings of any initial trier of fact. (*In re Anglin* (1988), 122 Ill. 2d 531, 538; *In re Rosin* (1987), 118 Ill. 2d 365, 378; *In re Schechet* (1985), 105 Ill. 2d 516, 523; *In re Berkley* (1983), 96

Ill. 2d 404, 410; *In re Wigoda* (1979), 77 Ill. 2d 154, 158-59; *In re Smith* (1979), 75 Ill. 2d 134, 138.) We acknowledge that the recommendations of both the Hearing Board and the Review Board resulting from their findings of fact are advisory and not binding. (*Anglin,* 122 Ill. 2d at 538; *Wigoda,* 77 Ill. 2d at 158.) We accord deference to the Hearing Board's findings of fact, however, for the Board is able to observe the demeanor of witnesses, judge their credibility and evaluate conflicting testimony. *Anglin,* 122 Ill. 2d at 538; *Rosin,* 118 Ill. 2d at 378; *Wigoda,* 77 Ill. 2d at 158.

Neither respondent nor the Administrator disputes the validity of the evidence presented to the Hearing Board. Both parties, however, disagree with the interpretation of that evidence by the Review Board. Respondent claims that the Review Board should not have adopted the Hearing Board's interpretation of the evidence. The Administrator asks this court to affirm the Review Board's adoption of the Hearing Board's conclusions, but to reject the Review Board's recommendation in favor of the Hearing Board's recommendation to disbar respondent.

The Hearing and Review Boards concluded that respondent violated Rules 1—102(5), 5—101(a), 5—104(a) and 7—101(a)(3) of the Code. Rule 1—102(5) states that a lawyer shall not "engage in conduct that is prejudicial to the administration of justice." (107 Ill. 2d R. 1—102(5).) Rule 5—101(a) states that "[e]xcept with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." (107 Ill. 2d R. 5—101(a).) Rule 5—104(a) states that "[a] lawyer shall not enter into a business transaction with a client if they have conflicting interests therein and if the client expects the lawyer to exercise

his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." (107 Ill. 2d R. 5—104(a).) Rule 7—101(a)(3) states that a lawyer shall not intentionally "prejudice or damage his client during the course of the professional relationship." (107 Ill. 2d R. 7—101(a)(3).) Respondent contends he has not violated any portion of the Code.

One reason respondent contends that the provisions of the Code do not apply to any of the transactions in question is because at the time respondent entered into the loan agreements, the other parties involved were not in an attorney-client relationship with him. While respondent admits that each of the investors in the case at bar was a client of his at one time, he asserts that in almost every instance he was not performing legal services for the investors at the time of the loans to PFI. He also asserts that those claimants who testified that they relied on his professional judgment were relying on his business, and not legal, judgment, and that he should not be held to the exacting standards of the Code in a question of business judgment. Similarly, he further contends that because the relationship between himself and the lenders was that of entrepreneur/promoter with investors, and not lawyer with client, he could not possibly have overreached the attorney-client relationship and violated Rules 1—102(5) and 7—101(a)(3).

We cannot agree with respondent's contentions. This court has established that an attorney's relation to a client ceases on rendition and satisfaction of the matter which the attorney was employed to conduct, in absence of special circumstances or arrangements which show a continuation of the relationship. (*People v. Wos* (1946), 395 Ill. 172, 177; *Herbster v. North American Co. for Life & Health Insurance* (1986), 150 Ill. App. 3d 21, 28.) We also have held that the existence of an attorney-client relationship creates a fiduciary relationship between

those parties as a matter of law. (*In re Schuyler* (1982), 91 Ill. 2d 6, 11.) In all eight instances of loans made by those who testified before the Hearing Board, the investors made the loans while the respondent was performing some legal service for them, or within a relatively short time thereafter. Respondent's whole basis for his relations with these people was his past or present relation to them as attorney. In the Eichler, Westphal, Daeumer, Volkening/Werner, Stark, and possibly Chesbrough situations, respondent performed legal services at the time of the loan, or afterward. In Chesbrough's case, it appears respondent had finished performing legal services for the client by 1973, but that the proceeds from the lawsuit were not distributed until 1986. While this is arguably only a limited legal responsibility, we have held that the limited nature of an attorney's duties does not lessen his responsibility to the client. (*Schuyler*, 91 Ill. 2d at 11.) Because respondent was performing legal services for these six clients at the same time these clients were loaning his corporation money, the existence of an attorney-client relationship, and therefore respondent's fiduciary duty, is indisputable.

Respondent also contends that, in the case of the remaining four clients, there was a definite point in time where respondent ceased rendering legal services to the clients before the loans were made. We note, however, that, as to five of respondent's clients, they directly invested the proceeds of the legal work respondent performed for them (Eichler and Hillquist), or the Hearing Board could have reasonably concluded that the funds which the clients loaned to PFI were products of the proceeds of respondent's legal work (Westphal, Volkening/Werner and Eckholm). All of the loans in these five situations, therefore, occurred so close in time to the respondent's legal services to each client as to cause the

client to believe that the respondent's business relations were a continuation of the attorney-client relationship. This is certainly reflected in the testimony of many of the client/creditors, who believed the respondent was acting as their attorney at the time the loans were made. See *International Paper Co. v. Lloyd Manufacturing Co.* (N.D. Ill. 1982), 555 F. Supp. 125, 132 (holding that an attorney-client relationship exists when a lay person submits confidential information to an attorney with the reasonable belief that the latter is acting as the former's attorney).

In a similar case (*In re Rosin* (1987), 118 Ill. 2d 365), an attorney closely associated with a stamp company was suspended from the practice of law for two years for his role in his client's investment of the proceeds from a personal injury settlement in the stamp company. (See *Hunniecutt v. State Bar* (1988), 44 Cal. 3d 362, 370-72, 748 P.2d 1161, 1165-66, 243 Cal. Rptr. 699, 704-05 (holding that there is an attorney-client relationship as a matter of law where client receives settlement proceeds and is then solicited by attorney to invest in attorney's business).) While *Rosin* clearly involved an ongoing attorney-client relationship (*Rosin*, 118 Ill. 2d at 380), this court held that the attorney's conduct in that case intentionally prejudiced and damaged the client's interests, in violation of Rule 7—103(a), for failure to make an adequate investigation of the company and for failing to adequately explain the nature of the investment (*Rosin*, 118 Ill. 2d at 382-83). The respondent in the case at bar has influenced two, and possibly three more, of his former clients in a similar manner.

Therefore, we see no reason to overturn the factual finding of the Hearing Board that respondent and the client/creditors who testified had an attorney-client relationship during the time periods relevant to the events surrounding the loans to PFI.

Also, even if we were to agree with respondent that he was not in an attorney-client relationship with the investors in this case when the loans were made, respondent would still be subject to the rigors of the Code. An attorney may be subject to discipline for conduct outside his professional capacity for any act that evidences an absence of professional or personal honesty that renders him unworthy of public confidence. (*In re March* (1978), 71 Ill. 2d 382, 391.) For reasons discussed in the remainder of this opinion, the actions of respondent in failing to disclose the financial problems of PFI to the potential investors would have evidenced enough of a lack of personal honesty on his part to subject him to the Code's disciplinary processes, even absent an attorney-client relationship. See *In re Pappas* (1988), 159 Ariz. 516, 521, 768 P.2d 1161, 1166 ("although [the attorney] may [have acted] as an investment advisor or otherwise, [he] was 'bound by the ethical requirements of [the legal] profession, and he may not defend his actions by contending that he was engaged in some other kind of professional activity' ").

The Hearing Board found that respondent violated the Code by entering into transactions which created a conflict of interest between himself and the client/creditors. The Board also found that respondent exercised undue influence over these clients, and overreached in the attorney-client relationships with them. The Board further concluded that respondent had a duty to fully disclose material information regarding his relationship with PFI and the entire financial background of himself and the corporation, and a duty to advise the client/creditors to seek independent counsel before investing.

This court has held that where a transaction occurs within an attorney-client relationship, the attorney is required to exercise a measure of good faith in dealing with clients which is much higher than what is required

of parties dealing at arm's length, and the fiduciary nature of the attorney-client relationship requires that we examine any transaction between respondent and the client/creditors in the case at bar with the closest scrutiny. (*Schuyler*, 91 Ill. 2d at 11.) This court has also held that where an attorney engages in transactions with a client and is benefited thereby, the burden rests on the attorney to show that it is fair, equitable and just, and that it did not proceed from undue influence. (*Schuyler*, 91 Ill. 2d at 11; *Turner v. Black* (1960), 19 Ill. 2d 296, 305; *McFail v. Braden* (1960), 19 Ill. 2d 108, 117.) In order to prove that the benefit received did not proceed from undue influence, the attorney must prove (1) that he made a full and frank disclosure of all the relevant information that he had, (2) that the consideration was adequate, and (3) that the client had independent advice before completing the transaction. *Schuyler*, 91 Ill. 2d at 15-16; *In re Anderson* (1972), 52 Ill. 2d 202, 206; *McFail*, 19 Ill. 2d at 117-18.

Respondent disputes all of the Hearing Board's findings. He contends there was no conflict of interest or undue influence present in these transactions. He bases this on the premise that he repaid the investors in whole or in part, and that he received no return on his personal investment. He also disagrees with the Hearing Board's finding that each client/creditor assumed that during the time periods relevant to this case respondent was exercising his professional judgment on their behalf, but that he was instead only looking out for his own interests. Respondent points to his personal guarantees on the promissory notes to show he held the investors' interests above his own. He further maintains that the business misfortunes which PFI encountered had nothing to do with his personal integrity. He also states that he could not have a conflict of interest with these clients under Rule 5—104(a), since he did not need to make a

disclosure of his own interests in PFI because the clients relied on his business judgment and not his professional expertise as a lawyer. He vehemently asserts that there is no evidence to support a conclusion of undue influence, because the record reflects that his clients approached him to invest in PFI and that he did not solicit the loans. Respondent urges this court not to punish his efforts to make PFI succeed by suspending his law license, compounding his already large financial loss.

Respondent argues alternatively that, even if he had to make a disclosure to these clients, the information he gave them at the time the loans were made was more than adequate, that he has proved that the loan agreements were fair and equitable, and that he did not overreach in attorney-client relationships. Respondent maintains that the data concerning the financial health of PFI was always available to the investors. He further claims that the advisers to some of the investors (Silvertsen and Stark) or some of the investors themselves (Volkening, Eckholm and Daeumer) were "savvy" businessmen who testified that they understood the risks of PFI as a fledgling enterprise and that several of them inspected the plant and witnessed the operation for themselves. Even if the other investors were not as well informed as these particular businessmen, he claims that all the investors assumed the risk.

While respondent admits that he never suggested that any of the client/creditors seek independent counsel, he insists that he either was ignorant of his obligation under the Code to make such a suggestion, or was acting under a good-faith belief that he had no such duty regarding such a purely business investment. Also, he contends that the widows involved were at least advised of other business opportunities but chose PFI as an investment.

Respondent further claims that his own personal investment of over $700,000, more than the combined contribution of these eight creditors, proves the fairness of the arrangement because he stood to lose much more than his clients. He also argues that the Hearing Board was unable to demonstrate the unfairness of these transactions. Respondent submits that the charge of overreaching is not supported by the record because the evidence reveals that, despite the clients' expressing trust and confidence due to his prior legal services for them, he never took advantage of the attorney-client relationship. This was because he responded to all inquiries made regarding the risks of investment. In respondent's mind, most of the investors were not interested enough to ask about the risks involved.

Again, we cannot agree with respondent's contentions. We find no reason to overturn either the Hearing Board's or the Review Board's findings. Respondent entered into transactions with clients from which he derived benefit. It is respondent's burden to prove that these transactions were fair and that they were not affected by undue influence. Respondent's contention that the Hearing Board must demonstrate the unfairness of the transactions before it can sanction him has no merit. *Schuyler*, 91 Ill. 2d at 11.

Our review of the record shows a complete lack of good faith on respondent's part in the dealings with these client/creditors. The respondent had an obligation, under the Code, to disclose all relevant information to each client at the time the loans were made. (107 Ill. 2d R. 5—104(a).) The clients had no obligation to inquire about the investment risks, and the lack of inquiry does not excuse the respondent's duty to disclose the material information. The record also belies respondent's claim that it was the clients, not he, who initiated these matters.

The only financial documents respondent maintained regarding PFI were misleading. His portrayal of PFI painted an overoptimistic picture of the corporation's worth and was designed to persuade his clients to loan money to a failing business enterprise. Even if the earlier loans were made to a fledgling corporation with the potential to eventually succeed, respondent's conduct in securing loans from clients after PFI began to experience severe financial difficulty was patently misleading. Respondent never made PFI's corporate tax returns available, which would have revealed the extent of the losses the corporation had suffered. While respondent claims that his attempts to protect his own investment, larger than the investment of the eight client/creditors combined, indicates that the transactions were fair and he was acting in good faith, all it actually reveals is that respondent secured large sums of money from his clients to protect his personal financial interests in the company. Therefore, we agree with the Hearing Board's findings of conflict of interest and overreaching.

Respondent has also failed to rebut the finding of undue influence. Respondent failed to advise these clients to seek independent advice before completing the transactions. (*Schuyler*, 91 Ill. 2d at 16-17; *In re Saladino* (1978), 71 Ill. 2d 263, 276; *In re Anderson*, 52 Ill. 2d at 207.) Respondent's proffered evidence of giving the widows alternative investment advice is not enough. While the failure to counsel clients to seek independent legal advice will not by itself subject an attorney to discipline (*Schuyler*, 91 Ill. 2d at 17), respondent has failed to counter the undue influence charges in other ways. As already discussed, respondent failed to fully disclose all relevant information. He also cannot claim ignorance of his ethical obligations as an excuse, and he cannot disclaim the Code by claiming he believed in good faith that such a rule did not exist. *In re Demuth* (1988), 126 Ill.

2d 1, 13 (Code's rules are mandatory—attorneys who fail to understand ethical obligations do so at their own peril).

Also, the record supports the Hearing Board's conclusion that the evidence clearly and convincingly reflects that respondent's conduct violated the Code. We therefore find no reason to disregard the findings of the Hearing Board.

We will, however, follow the recommendation of the Review Board in considering the appropriate sanction. The decision of what sanction is proper in a disciplinary proceeding rests with this court. (*In re Harris* (1982), 93 Ill. 2d 285, 296.) We make this determination in light of the purposes of our disciplinary process, which are to maintain the integrity of the legal profession, protect the administration of justice from reproach, and safeguard the public. *In re Himmel* (1988), 125 Ill. 2d 531, 544.

The Administrator argues that respondent, by insisting his conduct is beyond review by the court and his actions were those of a businessman and not a lawyer, demonstrates his fundamental misunderstanding of basic ethical obligations and demonstrates his current lack of fitness to practice law. The actual monetary losses of respondent's client/creditors also serves as damning evidence. While we basically agree with the Administrator's analysis of respondent's conduct, we believe disbarring respondent is too harsh.

In determining the quantum of discipline the court will mete out, we have held that the degree of punishment imposed in a disciplinary proceeding is based upon an evaluation of the evidence, the respondent's past record, his attitude at the disciplinary proceeding, and the best interests of society. (*Anderson*, 52 Ill. 2d at 213.) We have also stated on numerous occasions that we endeavor to achieve uniformity in imposing discipline, but that we also consider each case on its own merits. (*E.g.*,

*Rosin,* 118 Ill. 2d at 387.) While respondent's misconduct is serious, and it appears that he does not appreciate the importance of his ethical obligations, he has had a previously unblemished record for 26 years. The Review Board concluded that a two-year suspension would be sufficient deterrence to impress upon respondent and others the absolute necessity of full disclosure in business transactions with clients and the impropriety of overreaching in the attorney-client relationship. We conclude that we will serve the purposes of our disciplinary processes by enforcing the Review Board's recommendation for a lesser sanction. After reviewing decisions by this court involving similar misconduct and weighing the mitigating and aggravating factors, we hold that the proper sanction is the suspension of respondent from the practice of law for the period of two years.

Accordingly, it is ordered that respondent be suspended from the practice of law for two years.

*Respondent suspended.*