**In the Matter of Merrill L. SMITH.**

**In the Matter of Gregory B. SMITH.**

Nos. 18S00–8802–DI–255,
18S00–8808–DI–780.

Supreme Court of Indiana.

June 13, 1991.

Kevin P. McGoff, Indianapolis, for respondents.

Sheldon Breskow, Indiana Supreme Court Disciplinary Com'n, Indianapolis, for the Indiana Supreme Court Disciplinary Com'n.

## PER CURIAM.

This case is before us on two verified complaints for disciplinary action which, upon the joint motion of all parties, were consolidated. Respondent Merrill Smith has been charged in two counts with violating Disciplinary Rule 5–101(A), 5–104, 1–102(A)(4) and (5), and 2–105(A) of the *Code of Professional Responsibility for Attorneys at Law.* Respondent Gregory Smith has been charged with violating DR 5–101(A) and 1–102(A)(4) of the *Code.* After a hearing, the Hon. John L. Kellam, who was appointed Hearing Officer in this case, has submitted his findings of fact and conclusions of law.

Both Respondents have petitioned for review challenging the findings and conclusions. The issues raised in the Respondents' petitions will be addressed within the review process applicable to disciplinary cases. Such process involves a *de novo* examination of not only of the Hearing Officer's report but also of the entire record tendered in the case. The Hearing Officer's findings receive emphasis due to the unique opportunity for direct observation of witnesses, but this Court reserves the right to make the ultimate determination. *In re Kern* (1990), Ind., 555 N.E.2d 479; *In re Hampton* (1989), Ind., 533 N.E.2d 122.

We find that in March of 1977 Merrill Smith prepared a will for Mary Maxon and a Power of Attorney in her friend, Fred Wilson. Mary Maxon was 82 years old at the time. She was a wealthy widow whose late husband had been a joint founder of Maxon Corporation. Mary Maxon had no children, brothers or sisters but had a nephew, Harry Maxon, who served in different capacities with the Maxon Corporation.

In December of 1978, Mary Maxon broke her shoulder and was hospitalized until February 27, 1979. On December 28, 1978, she executed an "Authorization" prepared by Merrill Smith giving authority to Merrill Smith to assist Fred Wilson in caring for her affairs.

After Mary Maxon's release from the hospital on February 27, 1979, she was placed in a nursing home. She did not want to stay there and continuously insisted on returning to her home. Merrill Smith made arrangements with Rose Daniels, a trained nurse who had cared for 25

to 30 individuals, to take Mrs. Maxon from the nursing home during the days and return her in the evenings.

In February of 1979, Merrill Smith and Fred Wilson opened Mary Maxon's bank safety deposit boxes to discover them stuffed with tax free negotiable municipal bonds and corporate stock certificates worth hundreds of thousands of dollars. These were organized and cataloged by Dixie Hayes, a secretary in Respondents' law firm. From time to time the Respondent invested the earnings in certificates of deposit and additional stock.

On December 10, 1979, Mary Maxon executed a power of attorney prepared by Merrill Smith appointing him as her additional attorney in fact. Although Fred Wilson executed the checks for Mary Maxon's care and expenses, the checkbook and records were maintained in Merrill Smith's office and the checks were prepared by Dixie Hayes. Fred Wilson died in December, 1980, and on February 6, 1981, Mary Maxon executed another power of attorney prepared by Merrill Smith which appointed Gregory Smith, Merrill's son and law partner, as second attorney in fact.

During this time Mary Maxon's nephew, Harry Maxon, who had no legal responsibility or standing in regard to her affairs, advised Merrill Smith that he, Harry Maxon, would assume the responsibility of looking after her affairs in the Maxon Corporation and would act as a sort of family adviser.

About May or June of 1980 Merrill Smith advised Fred Wilson that he needed to purchase equipment to better maintain Mary's records. The manual inventory of Mary's bonds consisted of two pages and that of the stocks of two pages. The Respondent was interested in purchasing a Lanier word processing unit for a total cost, including installation, of $16,790. He wrote Harry Maxon about the proposed purchase suggesting that Mary Maxon's funds be used for this purpose but that the law firm contract with her to pay back the expense by making interest free monthly payments of $100 per month.

Harry Maxon agreed with the proposal but suggested a payment of $135 per month. Fred Wilson ultimately signed the contract. The contract provided that Mary Maxon would purchase the Lanier unit for use by the Smith & Smith law firm in exchange for the firm's interest free payment of $135 per month until the cost had been repaid in full; any unpaid balance would become immediately due and payable at her death. Neither Fred Wilson nor Harry Maxon discussed the matter with Mrs. Maxon.

Merrill Smith testified that he and she alone discussed the contract but there is no written memorialization or other evidence to indicate that she was aware of the transaction, that she approved it, that she was advised of the inherent conflict or that she was advised to seek independent counsel.

The Hearing Officer found that at no time either before or after the purchase did anyone advise Mary Maxon of the expenditure of her funds, obtain her consent or explain to her the inherent conflict present in such a transaction.

On December 12, 1980, and again on December 31, 1981, Merrill Smith credited his law firm with three thousand dollars ($3,000) credit, six thousand dollars ($6,000) total, against the firm's obligation to Mrs. Maxon under the contract. He claims that Mrs. Maxon wanted these credits to be gifts to the law firm for extra nice behavior and instructed him to handle the gifts in that manner. He observed, however, that he did not tell her to seek independent counsel regarding the matter as she would not have followed that advice. Neither the credits nor any of the monthly payments were reflected in the respective statements of cash assets, income and expenditures. The credits were also omitted from form IH–6, prepared by Merrill Smith and filed on April 18, 1983, in the Estate of Mary Maxon.

On December 12, 1980, while Fred Wilson was in Merrill Smith's office, Dixie Hayes was given a check for $1,000 from Mary Maxon's funds signed by Wilson and was told that she was doing a good job.

The following year, on December 15, 1981, Merrill Smith gave Dixie Hayes another check for $3,000 from Mrs. Maxon's funds signed by him. He indicated that he had spoken with Harry Maxon who thought Dixie Hayes deserved it for handling Mary Maxon's affairs. At about the same time, Mary Maxon had come to the law office, accompanied by at least one nurse who brought in two packages of cookies. When Dixie Hayes thanked Mary Maxon for the cookies, Mary appeared to not know for what she was being thanked.

On August 12, 1982, Merrill Smith gave Dixie Hayes a third check from Mrs. Maxon's funds, signed by him, this time for $3,000. Eleven days later, on August 23, Mary Maxon died. Dixie Hayes never spoke to Mrs. Maxon about the checks.

In December of 1981, at Harry Maxon's suggestion, Merrill Smith made gifts from Mary Maxon's assets to trusts benefitting Harry Maxon's three children and seven grandchildren totaling $27,714.30 and a gift of 1,000 shares of Maxon Corporation stock valued at $27 per share to Maxon Founder's Fund, a Ball State Foundation.

Later in December of 1981, Harry Maxon wrote to Merrill Smith advising that, as Mary Maxon's next of kin, he was "quite certain that if she were mentally in position to do so, she would wholeheartedly agree that" the Respondent and his staff should receive Christmas bonuses of $10,000 to Merrill Smith, $5,000 to Gregory Smith and $3,000 to Dixie Hayes. The Respondent Merrill Smith did as suggested and issued checks for the suggested amounts from the assets of Mary Maxon to himself and his son.

The Respondent testified that Mary Maxon gave her complete consent in general principle, but had no knowledge nor gave her consent to the specific figures. The Hearing Officer found that at no time either before or after the transfers from Mary Maxon's funds to Merrill Smith, Gregory Smith or Dixie Hayes did Merrill Smith or anyone else explain to Mary Maxon the conflict of interest inherent in such gifts nor did anyone obtain her consent.

After making specific findings of fact the Hearing Officer concluded that Mary Maxon was not only unaware but was mentally incompetent at the time of the gifts and during the last year and a half of her life.

Mary Maxon died on August 23, 1982. An inventory of her assets at the time of her death reflected a total estate of $4,951,573.96.

The Respondents vigorously challenge the Hearing Officer's findings on the issue of Mary Maxon's lack of knowledge and consent contending that the only evidence introduced at trial on this issue is the testimony of Merrill Smith to the contrary.

The Respondents are charged under the provisions of the *Code of Professional Responsibility* which sets out the standards of ethics during the relevant period of time. Disciplinary Rule 5–101(A) provides:

Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

Disciplinary Rule 5–104(A) provides:

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

Consent after full disclosure necessitates the disclosure of the existence of a conflict, the nature of the conflict, advisement that the exercise of the lawyer's independent professional judgment could be affected by the lawyer's own interests, and an insistence that the client seek independent legal counsel. See *In re Herbert* (1990), Ind., 553 N.E.2d 130, *In re Briggs* (1987), 502 N.E.2d 879; *In re Orbison* (1988), Ind., 524 N.E.2d 792; *In re Tew, Jr.* (1986), Ind., 498 N.E.2d 387; *In re Watson* (1985), Ind., 482 N.E.2d 262; *In re Tripp* (1986), Ind., 493 N.E.2d 458; *In re Farr* (1976), 264 Ind.

153, 340 N.E.2d 777; *In re Burns* (1987), Ind., 516 N.E.2d 35.

The Hearing Officer concluded that both Respondents engaged in the charged misconduct. He based this on two factors: first, a factual finding that Mary Maxon was incompetent to give her informed consent; the second, a legal presumption that where an attorney-client relationship exists, the attorney's receipt of beneficial interests from the client raises a presumption of overreaching and undue influence.

■ The Respondents challenge this conclusion arguing that: 1) Mary Maxon was competent to consent and 2) the presumption of undue influence during the attorney-client relationship is restricted to only civil matters because (a) the higher level of proof required in a disciplinary proceeding, clear and convincing evidence, somehow restricts the shifting of the burden of proof and (b) the presumption is being applied retroactively.

Respondents' arguments are unpersuasive. Several persons testified as to the mental state of Mary Maxon. Rose Daniels described Mrs. Maxon as having a bad memory, short span of concentration and a knowledge of people, but not names. In January, 1980, Mrs. Maxon was asking the same question, when she could go home, about 35 to 40 times per day. When she desired to make a purchase, Mary Maxon acquired Merrill Smith's approval, and, on one occasion, sought permission to buy a $6 dress from a Salvation Army shop. During the earlier part of the association, Rose and Mary took walks during which Mary collected pigeon feathers and rubber bands from the streets.

During the year 1981, Mrs. Maxon had returned to her home. By December of 1981, Mrs. Maxon could not handle herself, let alone her affairs. In early summer of 1982, it became necessary to restrain Mrs. Maxon in a rocking chair to keep her from wandering. In 1982, she was unable to converse and gradually became noncommunicative. Rose Daniels opined that during her entire employment as caretaker for Mrs. Maxon, the latter was never mentally competent. Dixie Hayes testified that

Mary Maxon was unaware of the gifts. Harry Maxon noted her incompetence in his letter suggesting the giving of Christmas bonuses. A former associate with the Smith and Smith law firm also concluded that she was incompetent to make gifts of her funds.

These findings establish that Mary Maxon was an elderly woman, physically unable to care for herself, who did not remember names, did not know the extent of her assets, and was often observed in a confused state.

■ Although this is a *de novo* examination of all tendered matters, the Hearing Officer's assessment of the evidence and his judgment in reconciling conflicting testimony carries great weight. *In re Kern*, *supra*. Here, he weighed this evidence against Respondent's testimony to the contrary and concluded that Mary Maxon was not competent. We find that there is ample evidence to support the finding that the Commission proved by clear and convincing evidence that Mary Maxon was incompetent to give her informed consent.

The foregoing findings resolve any questions as to Mary Maxon's informed consent; however, we view this to be an appropriate opportunity to address the issue of a rebuttable presumption raised by the Respondents.

■ Indiana case law recognizes that transactions entered into during the existence of a fiduciary relationship are presumptively invalid as the product of undue influence. Transactions between an attorney and client are presumed to be fraudulent, so that the attorney has the burden of proving the fairness and honesty thereof. *Olds v. Hitzemann* (1942), 220 Ind. 300, 42 N.E.2d 35; *Sweeney v. Vierbuchen* (1946), 224 Ind. 341, 66 N.E.2d 764. Such transactions during the confidential relationship are closely scrutinized by the courts and are regarded with suspicion; they are presumptively invalid as the product of undue influence. *Briggs v. Clinton County Bank & Trust Co.* (1983) Ind.App., 452 N.E.2d 989. The higher standard of proof

placed on the Commission cannot affect the operation of this presumption.

Other jurisdictions have more specifically articulated the applicability of presumption within the disciplinary process. *In re Imming* (1989), 131 Ill.2d 239, 137 Ill.Dec. 62, 545 N.E.2d 715; *In re Schuyler* (1982), 91 Ill.2d 6, 61 Ill.Dec. 540, 434 N.E.2d 1137; *Committee on Professional Ethics & Conduct v. Behnke* (1979), Iowa, 276 N.W.2d 838; *In re Theodosen* (1981), S.D., 303 N.W.2d 104; See Law.Man. on Prof.Cond. (ABA/BNA) 51:601 (1984).

Additionally, Admission and Discipline Rule 23, Section 14, provides, among other things, that the Respondent in a disciplinary proceeding shall have the right to produce at the hearing and require the production of evidence and witnesses *as in civil proceedings* (emphasis added). Ethical consideration 5–5, expounding on the meaning of Canon 5, advises that if a lawyer accepts a gift from his client, he is peculiarly susceptible to the charge that he unduly influenced or overreached the client and that, other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client.

■ Indeed, public policy necessitates such a shift in the burden of proof. In its absence, an attorney may freely misappropriate testator's property or make himself a beneficiary in a will knowing full and well that at the death or incapacity of the client all evidence against the lawyer would die with the client. A disciplinary proceeding is not intended for the purpose of punishment, but rather to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and public from unfit persons. *In re Moore* (1983), Ind., 453 N.E.2d 971. To hold, as the Respondents would have us, that the close scrutiny of attorney/client transactions in the pursuit of private civil rights is less necessary in the enforcement of public interests in the disciplinary process is incongruous with the essence of these proceedings. In this case, we find that the self serving testimony of the beneficiary of Mary Maxon's largess falls far short of what is required to overcome the presumption.

We note that Rule 1.8(c) of the present *Rules of Professional Conduct* which became effective January 20, 1987, and superseded DR 5–101(A) clarifies any misconception as to the intent of this prohibition by simply stating that a lawyer shall not prepare any instrument giving him or a relation a gift from a client other than a relation.

■ Respondent Gregory Smith contends that he had no independent duty as an attorney for Mrs. Maxon to assure that she was fully advised as to the inherent conflict and consented in giving him a gift. This argument is untenable. As Mrs. Maxon's attorney, Gregory Smith was bound by the very same duties and obligations inherent in the attorney-client relationship. The professional judgment of a lawyer should be exercised solely for the benefit of the client and should be free of compromising influences and loyalties. *In re Burns, supra.*

■ For the first time in this review process, Gregory Smith challenges the entire proceeding against him arguing that he was denied due process by not being timely notified of these allegations so as to allow him to defend himself. In support of this argument he merely recites the dates on which the grievances and the verified complaints were filed and simply asserts that the passage of time and death of a witness rendered him unable to insure that he was better prepared to defend the charges. We find this contention untenable as such unsupported allegations do not raise an issue of due process violation.

■ In light of the foregoing considerations and findings of fact, we conclude that by making gifts to himself, his son, his secretary and his law firm from the entrusted assets of an elderly client who was mentally incompetent Merrill Smith violated DR 1–102(A)(5) and DR 5–101(A) of the *Code.* By entering into a contract for the purchase of the Lanier word processing equipment with the funds of his client and

arranging for interest free repayment without informed consent after full disclosure, Merrill Smith violated DR 5–104(A) and DR 1–102(A)(4) and (5) of the *Code*.

■ We find further that by accepting a gift from the entrusted funds of the firm's client for whom he held power of attorney, without her informed consent after full disclosure, Gregory Smith violated DR 5–101(A) of the *Code*. The findings do not provide a sufficient basis to conclude that Gregory Smith engaged in conduct involving fraud, deceit or misrepresentation or conduct prejudicial to the administration of justice in violation of DR 1–102(A)(4) or (5).

Under Count II of the charges against Merrill Smith we find that on November 19, 1982, less than three months after the opening of the estate, Merrill Smith filed his Petition to Fix and Allow Attorney and Executor Fees. The petition was filed at that time, in order to avoid having the newly elected regular judge rule on the petition. An evidentiary *ex parte* hearing was held before a judge *pro tempore* at which Merrill Smith testified that he and his law partner, Gregory Smith, and the law firm secretaries had spent an estimated 635 to 640 hours on the estate. In said petition, he informed the court that the Lanier word processing equipment was purchased solely for keeping record of the contents of Mary Maxon's lock boxes while, in fact, only 5% of the unit's capability was utilized for Mrs. Maxon's affairs. He further advised the court that all of the work performed by him and his law firm prior to Mrs. Maxon's death should be considered as part of the administration of the estate, but he failed to advise the court that while she was alive the firm had consistently been paid its attorney fees, specifically $4,500 in 1979, $7,450 in 1980, and $19,365.50 in 1981.

Within ten days of Mary Maxon's death, Merrill Smith, as Executor, paid himself and his law firm $1,047.67 from the assets of the Maxon Estate, as fees for pre-death legal services to Mrs. Maxon. Merrill Smith continued to pay himself and his law firm from the Maxon Estate assets legal fees of $2,000 per month from August to December of 1982 for a total of $8,000. He did not obtain court approval for these fees and never disclosed to the court having received them.

The petition requested attorney fees of $200,000 and executor's fees of $100,000. The fees were initially approved by the judge *pro tempore*. However, upon the filing of objections by the Salvation Army, one of the residuary legatees, an extensive hearing was held before a special judge who granted the objections and ordered that the fees be reduced to $50,000 as executor fee and $90,000 as attorney fees.

At such hearing three witnesses with extensive probate experience in large estates placed the range of hours necessary for an estate such as Mrs. Maxon's between 400 to 700 hours and the combined fee between $110,000 to $150,000. There was testimony justifying the fees based on the application of a percentage of the estate assets, but the Hearing Officer found these to be to the exclusion of the other pertinent factors. Although the Respondent testified that he spent in excess of 3,500 hours in settling the estate, he presented no time records or other documentation to substantiate his claim. His secretary, Dixie Hayes, indicated that about two to five hours per week were consumed with work on the Maxon Estate.

In January 1988, the Indiana Court of Appeals upheld the order reducing the fees.

At the time of the hearing in this proceeding the Respondents had not repaid any of the attorney and executor fees collected by the Smith law firm as ordered by the Court of Appeals.

■ After the Hearing Officer had submitted his findings and conclusions, the Respondents forwarded to this court a copy of an unverified document entitled "Release." This document indicates that on December 8, 1989, approximately one year after the hearing in this disciplinary matter took place, the Estate of Mary Maxon settled for the refund of only $60,000 of fees and released the Respondents from any

other claims. The Commission has filed its opposition to the consideration of this further evidence. It does not challenge the veracity of the document's content but the fact that it was submitted after the record was closed.

■ Information such as restitution, repayment, and return of property is of paramount interest to this Court. When tendered to this Court in a manner other than through the record it may be considered as advisory in nature in the imposition of sanction in the same manner as a trial court may consider information from a presentence report. In this instance, the refund of $60,000 of fees in light of the ordered $160,000 is not necessarily prejudicial to the Commission's case. In light of this and the foregoing consideration, the Commission's motion in opposition is overruled.

Respondent Merrill Smith did not repay the balance owing on the Lanier contract until January 10, 1983, even though the contract required such repayment upon Mary Maxon's death.

Neither of the Respondents have ever repaid the Maxon Estate any portion of the so-called gifts to the Respondents and their secretary or the $6,000 credit applied from Mrs. Maxon's funds toward their obligation on the Lanier contract.

■ In his petition for review, Merrill Smith contends that the $300,000 fee was not charged by him but rightfully awarded to him by the trial court after a hearing. He further argues that the Hearing Officer, in concluding that the fee is excessive, incorrectly evaluated the testimony relative to this issue.

Disciplinary Rule 2–105(B) under which Merrill Smith is charged enumerates the factors to be considered as guides in determining the reasonableness of a fee as follows:

DR 2–105(B) ...

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

Although the factors set out in DR 2–105(B) are consistent with the factors considered by a trial court in granting a reasonable fee in probate matters, the two proceedings address two wholly different underlying issues.

■ Whether or not the fee charged in this instance is excessive is a question of public import; it has an impact on the availability of legal services to the public, the administration of justice and, ultimately, reflects on an attorney's professional status. The Disciplinary Rules exist independently of any other legal or moral obligations. They state a minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. *In re Aungst* (1984), Ind., 467 N.E.2d 698. This Court has often held that the discipline of a member of the Bar of this state is independently determined from any other proceeding. *In re Kern*, supra; *In re Hampton*, supra; *In re Mann* (1979), 270 Ind. 358, 385 N.E.2d 1139. Within this disciplinary context, the determination of a proper fee requires consideration of the interests of both client and lawyer. Our system of free enterprise allows great latitude to parties contracting for the performance of legal services. This freedom, however, is tempered by a public policy concern that excessive cost of legal service deters the public from using the legal system in the protection of rights. When a particular fee is in excess of what is deemed reason-

able in the community, without there being any evidence of the factors enumerated in Disciplinary Rule 2–105(B), charging and collecting such a fee raises to the level of professional misconduct. *In re Brown* (1987), Ind., 511 N.E.2d 1032; Ethical Consideration 2–17.

■ The awarding of attorneys' fees as part of the probate of an estate is governed by the Indiana Probate Code, IC 29–1–10–13 specifically, which authorizes the trial court to fix reasonable attorney and executor fees. The proper amount of these fees is left to the trial court's discretion. *Matter of Estate of Meguschar* (1987), Ind. App., 511 N.E.2d 307, *Pleska v. Zakutansky* (1984), Ind.App., 459 N.E.2d 745, trans. denied; *Mikesell v. Mikesell* (1982), Ind. App., 432 N.E.2d 55, trans. denied; *Matter of the Estate of Kingseed* (1980), Ind.App., 413 N.E.2d 917, trans. denied; *Matter of the Estate of Newman v. Hadfield* (1977), 174 Ind.App. 537, 369 N.E.2d 427.

■ In making the allowance of attorney and executor fees, the trial court may take into account factors such as the labor performed, the nature of the estate, the difficulties attending the recovery of the assets and location of heirs or devisees, settlements in the estate, the peculiar qualifications of the administrator and the factors enumerated in DR 2–105, "the key apparently being that they be reasonably commensurate to the time and work involved." *Matter of Estate of Meguschar, supra.*

■ Evidence relating to the allowance of fees by the trial court is but one of the factors which this Court considers in making an assessment under DR 2–105 as to whether the fee is excessive.

In this case, Merrill Smith obtained approval of the $300,000 fee in an *ex parte* proceeding presented intentionally to a judge *pro tempore* in order to avoid appearance before the regular judge. In said petition, Merrill Smith stated that he had represented the decedent for approximately 6 years prior to her death and proceeded to misinform the court by stating that "(A)ll of the work performed by Petitioner and his law firm prior to decedent's death should be considered as part of administering her estate." He did not advise the court that he and his law firm had been fully compensated for this work. In addition, he falsely advised the court that the Lanier word processor was purchased solely for maintaining Mary Maxon's records.

Under such circumstances, the *ex parte* approval of fees cannot be considered an informed judicial approval and, as such, is not persuasive.

The findings in this case also indicate three expert witnesses found the claimed fee excessive by at least 100%. Mary Maxon's assets were extensive but they were simple to administer and required no unique skills. There is no evidence of any specific or unreasonable time constraints placed on Respondent Merrill Smith; there is no evidence that the administration of the estate precluded Merrill Smith or his law firm from other employment; there was a six year professional relationship, but the Respondent Merrill Smith and his law firm were not only fully compensated but also received other beneficial interests; there is no evidence that Respondent's experience, reputation or ability warranted an extraordinary fee in excess or what is customary nor was there any evidence that such special skills were needed in the administration of the Maxon Estate.

The foregoing facts are clearly convincing that a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Accordingly, we conclude that Merrill Smith charged an excessive fee in violation of DR 2–105(A).

■ Having found professional misconduct, this Court must now assess appropriate sanctions. We see before us a skilled lawyer who was entrusted with the sizable estate of an elderly client. While the client's mental and physical condition deteriorated, Respondent Merrill Smith proceeded to help himself, his law firm, his son and law partner, and his legal secretary to the entrusted assets through a succession of so-called gifts and a beneficial business transaction. He has charged and collected

an excessive fee based upon a petition containing false and misleading information. And most disconcerting, he has failed to return any of the gifts and has managed to avoid refunding $100,000 of the excessive fee collected from the Maxon Estate.

These actions render Respondent Merrill Smith's misconduct far more grievous than a mere conflict of interest. He not only failed to exercise his independent professional judgment on behalf of his client but used his position of trust to enrich himself and those around him from his client's funds. An examination of the nature of the violation, the specific acts of Respondent Merrill Smith, our responsibility to preserve the integrity of the Bar, and the risk to which the public will be subjected if the Respondent is permitted to continue in the profession, convinces us that a substantial period of suspension is warranted.

Upon an examination of Gregory Smith's particular acts and omissions, we find that his culpability is of a lesser degree than that of Merrill Smith. He shared the benefits of his partner's misconduct but his involvement was more limited, and he remained a passive recipient. However, this in no way diminishes his independent duties to his client and his responsibilities under the *Code* as a fiduciary entrusted with a comprehensive power of attorney. When he undertook the power of attorney on behalf of Mrs. Maxon, he undertook a duty to use his independent professional judgment on behalf of his client. By his actions as set out in the foregoing findings, he breached that duty. In light of these considerations and by virtue of the misconduct set out above, this Court concludes that a brief period of suspension with automatic reinstatement is warranted.

It is, therefore, ordered that the Respondent Merrill Smith is suspended from the practice of law for a period of two (2) years beginning July 15, 1991. It is further ordered that the Respondent Gregory Smith is suspended from the practice of law for a period of ninety (90) days beginning July 15, 1991.

Costs of this proceeding are assessed against the Respondents.