In the Matter of Andrew
C. MATERNOWSKI

and

Stephen W. Dillon.

Nos. 49S00–9312–DI–1321,
49S00–9312–DI–1322.

Supreme Court of Indiana.

Dec. 13, 1996.

Stephen W. Dillon, Andrew C. Maternowsk, Indianapolis, Kevin McGoff, McGoff & Kiefer, Indianapolis, for respondents.

David B. Hughes, Trial Counsel, Indianapolis, for Indiana Supreme Court Disciplinary Com'n.

### DISCIPLINARY ACTION

PER CURIAM.

Criminal defense lawyers with policies against their client's cooperating with the government cannot accept payments from third parties whom they have reason to believe may be accomplices without breaching the duty of loyalty and independence they owe their client.

The Indiana Supreme Court Disciplinary Commission charged each of the respondents with one count of professional misconduct. The allegations emanated from the respondents' representation of a client who stood charged in the United States District Court for the Southern District of Indiana with criminal offenses involving the possession and distribution of cocaine. On the Commission's motion, this Court consolidated the two disciplinary cases, and a hearing officer appointed by this Court pursuant to Admission and Discipline Rule 23 heard them together and tendered his findings of fact, conclusions of law and recommendations. The respondents petitioned for review, challenging the hearing officer's findings of misconduct, and each side briefed its respective position. In addition, the Indiana Association of Criminal Defense Lawyers moved for leave to file and tendered a *Brief of Amicus Curiae.* We

grant their motion. The consolidated case is now before us for final adjudication.

There is no significant disagreement as to the facts of this case. The respondents, Stephen W. Dillon and Andrew C. Maternowski, are associated together in the practice of law. Prior to August 1, 1994, Maternowski was an employee of Dillon. Since August 1, 1994, the respondents have shared office space. They practice predominantly in the criminal defense area and, in particular, the defense of persons charged with drug related offenses. Both respondents have a policy of refusing to represent criminal defendants who indicate any willingness to cooperate with the government. The respondents apparently are not alone in taking this position; the hearing officer found that some attorneys in other jurisdictions follow a similar policy. The respondents contend this policy is based on their strongly held convictions that an attorney should not represent persons who avoid or mitigate responsibility for their own crimes by identifying or testifying against others and that cooperation leads to no better outcome for the cooperating party. The respondents advise their clients of their policy and refer those defendants who wish to cooperate with the authorities to other lawyers or to the Indianapolis Bar Association referral program.

On February 3, 1992, two former clients of Maternowski met with him in his office, told him that a friend of a friend had been arrested, and asked him to go and see her in jail. The friend of a friend was Robin Vone, an 18–year old high school student from Oakland, California. On February 1, 1992, Vone had flown to the Indianapolis airport carrying cocaine on behalf of her boyfriend and another individual from California. She was to deliver the cocaine at the Indianapolis airport to yet another individual whom she had met on a previous occasion. Vone knew the identity of the person who had provided her with the cocaine and of the intended recipient. At the airport, Vone was speaking with the person she was to meet when members of the Drug Task Force approached her. The person fled, was chased, but successfully eluded the authorities. Vone was arrested and charged with the federal crime of posses-sion of cocaine with intent to distribute a Schedule II narcotic controlled substance. This was Vone's first arrest.

The morning after receiving the request, Maternowski visited Vone in the Marion County Jail and advised her that her friends had asked him to speak with her. Neither Vone nor the respondent mentioned the person who had asked Maternowski to visit her, although it was Maternowski's impression that she was expecting a visit from a lawyer. Maternowski advised her that his retainer is $5,000 and that the fee could be as high as $20,000 if the case went to trial, but that he was not sufficiently familiar with the case to give her a precise estimate. Also, he specifically asked Vone if she could pay such a fee and how she would do it, at which Vone indicated that she would have to call her family.

On February 4, 1992, two individuals who introduced themselves as "T" and "Moe" visited Maternowski and advised him that they were Vone's friends. They paid the respondent $5,000 in cash for which they declined a receipt. There was no further conversation as to the remainder of the fee, the respondents' policy or how the case would be handled. Maternowski never again met these individuals, but, at a later point in the proceeding, he communicated with a Tim Smith, Vone's boyfriend, about Smith's difficulty in getting mail to Vone, Vone's case in general, and about the procedure for appealing Vone's case after sentencing. This later communication led Maternowski to assume that "T" was Tim Smith.

Maternowski also spoke with members of Vone's family and with her mother in California who advised him that his attorney's fees would be paid. After the initial cash retainer was paid in the office, Dillon picked up a second payment from a man he met at a suburban Indianapolis motel, and later two unidentified women delivered additional cash to the respondents' secretary at the law office. Dillon did not discuss the case with the person paying the money. Dillon offered to give a receipt but the payor declined the offer. All payments were recorded on the office ledger. Also, from time to time, un-identified persons deposited funds in the of-

fice trust account for Vone's commissary account which Maternowski or a secretary funded at the jail.

In the course of their initial discussion, Maternowski told Vone that he did not represent "snitches" and that if, at any time, she decided to cooperate with the government, she should tell him and he would advise the authorities and withdraw from her case. Also he told her that if she were to cooperate, there was no way to keep this information from the drug dealers and no way to predict their reaction. Vone was satisfied with the respondent as her lawyer.

The responsibility for the Vone case was primarily Maternowski's although Dillon met Vone and participated in her detention hearing and a later suppression hearing. By a letter of February 14, 1992, Maternowski informed Vone that a $5,000 retainer fee had been paid on her behalf and that his minimum fee would be $10,000 and could go as high as $20,000. In the letter, Maternowski also explained at length the possible sentences for the offense with which Vone had been charged and certain aspects of the Federal Sentencing Guidelines. Among other things, the letter stated:

> We are not preventing you from cooperating and must advise you that cooperation might allow you to do less or even no time and possibly prevent a conviction entirely. Our position is that jail time is only one fact of the factors to be considered when deciding whether or not to cooperate. Other factors include your safety, your family's safety, and your own piece of mind.... If you decide to cooperate at any time, let us know, and we will tell the Government.

The letter further contained a statement, which Vone signed, indicating that she understood that the attorneys would withdraw if she decided to cooperate with the government. Throughout the proceeding, Maternowski advised Vone that fees were being paid on her behalf and that money was being deposited for her use at the jail commissary, but did not discuss the source of such funds. Vone made conflicting statements as to whether or not she knew the identity of the person or persons making payments on her behalf but she assumed that the person paying was the person for whom she was carrying the cocaine.

A Drug Enforcement Administration agent first broached the issue of cooperation after Vone's detention hearing. Maternowski relayed this to Vone who indicated she did not wish to cooperate. On March 11, 1992, the court denied Vone's motion to suppress. Thereafter, the respondent discussed at length Vone's options with her and also followed up with a letter setting out her options. On April 7, Maternowski spoke with the Assistant United States Attorney and both agreed that Vone would be offered a conditional plea, with an opportunity to appeal the suppression issue, and she would receive a sentence of sixty months.

In the course of the representation, Vone discussed Maternowski's withdrawal from her case on two occasions. The first discussion was precipitated by Vone who suggested that she cooperate with the government by giving falsely the name of a dead person as her source. Respondent Maternowski advised against this course of action. Also, prior to her entering a plea, the court asked Vone, on the record, if she wanted another lawyer, and suggested that the only way she could be sentenced for less than five years was by cooperating. She declined.

But from time to time, Vone changed her mind as to whether or not she should cooperate. She told Maternowski on fifteen occasions that she wanted to cooperate with the government. He gave her his opinions and, although she did not feel that Maternowski was pressuring her, she trusted his judgment and followed his advice.

After entering her guilty plea, Vone wrote a letter to the judge in her case stating, among other things:

> At one point in my life I was going to take 5 years in prison for someone else's drugs.... I was doing it because I thought I was in love. Judge ..., I have made up my mind. I have decided to turn State's evidence.... My lawyer is not too fond of what I am doing. Every time I call and ask him to withdraw himself from my case he comes with a reason I should

not. This is something I want to do and he doesn't understand....

Also in one of her letters to the judge, Vone stated that she was aware that back in Oakland, threats had been made to people she knew, and a friend's house was blown up and a baby and the mother killed before the friend could give testimony in a murder case. Vone's inclination to not cooperate was influenced to a certain extent by this fear factor.

In early June of 1992, Vone telephoned Assistant United States Attorney Dowd who was handling her prosecution and requested that he come to jail to talk to her about cooperating with the government. Dowd advised her to contact her attorney and also advised Maternowski of Vone's intentions. Maternowski visited Vone and, during the course of their conversation, she again changed her mind.

In late September of 1992, Vone contacted the Deputy United States Marshal at the Marion County Jail. As a result, an Assistant United States Attorney filed a Motion for Appointment of Counsel, and Attorney Gregg Morelock was contacted by someone from Magistrate J. Patrick Endsley's office and asked to represent Vone. Morelock visited Vone in jail and explained his appointment and the purpose for his visit. Vone did not tell him that she was already represented and that her lawyers were preparing her appeal to the Seventh Circuit Court of Appeals. Vone and Morelock met with a DEA agent and an Assistant United States Attorney in order for the government to determine the quality of the information Vone would be supplying. During the meeting, Vone gave the name of a Jack Bastan as her boyfriend and the person for whom she had been carrying the drugs. In a later conversation with a volunteer from the Offender Aid and Restoration Program in the Marion County Jail, Vone stated that she had not been truthful in her statements to the government. At the conclusion of the meeting, Vone consented to take a polygraph and asked that it be arranged. Despite this, Morelock indicated that her decision to cooperate vacillated, she was "wishy-washy" and had no firm conviction as to what she wanted to do.

On October 1, 1992, Vone called Maternowski and told him about Morelock's involvement. She asked Maternowski to come over and find out what was going on. Maternowski met with her in jail and recorded her statement. This time, Vone indicated that she did not want to cooperate. Maternowski's inquiry into how and why a lawyer was appointed for Vone went unanswered as the pleading the government had filed to have Morelock appointed was ordered sealed by the court. Morelock was shocked to find out that Vone had counsel of record who were already perfecting her appeal. On October 20, 1992, Morelock again met with Vone who now stated that she did not want to submit to the polygraph examination and did not wish to cooperate.

The Federal Sentencing Guidelines establish a framework for imposing sentences and the method by which a defendant may benefit by cooperating with the government. A determinative factor is the prosecution's assessment of the nature and extent of the information provided by the defendant and their request for a departure from the established sentence. However, the ultimate decision as to sentence remains with the court. A criminal defense expert opined that under the guidelines and the policy of the U.S. Attorney's office in existence at the time, Vone would not have served less than 41 months under the best of circumstances.

The Commission charged that each respondent violated Ind. Professional Conduct Rule 1.7(b), which generally prohibits a lawyer from representing a client if the representation of that client may be materially limited by the lawyer's responsibilities to a third person or by the lawyer's own interests, and Prof.Cond.R. 1.8(f), which generally prohibits a lawyer from accepting compensation for representing a client from one other than the client. Both rules contain exceptions where, *inter alia*, the client consents after consultation.

As Amicus helpfully identifies, the respondents' policy of non-cooperation and receipt of fees raises broad policy issues under Prof. Cond. Rules 1.7(b) and 1.8(f). A lawyer who has a deep-seated personal belief that a criminal defendant should never cooperate with

governmental authorities will likely encounter difficulty in providing independent, objective advice in presenting the defendant with all available alternatives. The same is true if the lawyer suspects or has reason to suspect that his or her attorney's fees are being paid by the same persons who would be adversely affected by the client's cooperation with the government. However, the factual scenario before us raises far narrower issues which are limited by the circumstances of the case. We must decide (1) whether, in light of their strong personal conviction on the subject of cooperation, the respondents' advice to a defendant vacillating on the subject, placed them in an impermissible conflict situation; and (2) whether this, coupled with the suspected source of attorney's fees, created inherent obstructions to the lawyers' independent judgment.

The respondents argue that under Prof. Cond.R. 1.2(c)[1] they could limit the objectives of the criminal representation if the client consents after consultation. It is their contention that Vone gave her express consent to the limitation. The respondents are not charged with violating Prof.Cond.R. 1.2(c) but with continuing to represent a client when the client's interests came in conflict with the interests of respondents and third parties. However, we note that even under Prof.Cond.R. 1.2(c), meaningful consent to a limitation on the lawyer's scope of representation must be based on full, objective disclosure and unbiased advice. For the reasons stated below, we find that the respondents were not in a position to give such objective advice.

█ As to the charged violations under Prof.Cond.R. 1.7(b) and 1.8(f), the respondents again argue that they had Vone's express consent to represent her after sufficient discussion with her about their policy. We disagree.

The pertinent part of Rule 1.7(b) provides that:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation....

It is undisputed that Vone vacillated tremendously on whether or not to cooperate with the government. Throughout the representation, she advised Maternowski on as many as fifteen occasions that she wanted to cooperate. Contrary to their written promises to do so, neither respondent informed the government or filed a motion to withdraw. In each instance, it was Vone who initiated the discussion of possible cooperation, while Maternowski advised against it. Vone was a young first offender incarcerated in a foreign jurisdiction and separated from family and friends. She looked to Maternowski for guidance with respect and trust; this placed him in a powerful position of influence. At each indecisive juncture, Maternowski stepped in to tip the balance against her cooperating with the authorities. Vone's very indecisiveness on this question necessitated a totally objective counsel, not one who followed a stated policy against such practices. Once Vone tried to change the terms of the representation, the respondents had a duty to withdraw, not try to convince the client to continue the representation under the lawyers' conditions.

The Comment following Prof.Cond.R. 1.7 provides added insight as to consent in such conflict situations. It states that when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstance, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent. *Matter of Kern,* 555 N.E.2d 479 (Ind.1990). The respondents' espoused policy and negative opinion of cooperating with the government was in direct conflict with the indecisive position in which Vone

---

1. Prof.Cond.R. 1.2(c) provides: "A lawyer may limit the objectives of representation if the client consents after consultation."

found herself. Vone needed and deserved the independent counsel of a lawyer who could review objectively her particular case and prospects, and give guidance suited to her needs, not to the lawyer's own blanket opinions and moral objections. No disinterested lawyer could conclude that under these circumstances the respondents could reasonably believe that the representation would not be materially affected by the lawyers' opinions and beliefs.

 The pertinent provisions of Prof. Cond.R. 1.8(f) state that:

A lawyer shall not accept compensation for representing a client from one other than the client unless:

(1) the client consents after consultation;

(2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

(3) information relating to representation of a client is protected as required by Rule 1.6.

The Comment to Rule 1.8 expounds further that the rule requires disclosure of the fact that the lawyer's services are being paid for by a third party. We find that a knowing consent after full disclosure necessitates a much greater explanation than Maternowski gave Vone.

The findings before us indicate a reasonable possibility that the respondents' fees were paid by Vone's accomplices. Likewise, the findings indicate a reasonable possibility that Vone's accomplices sought out the respondents and paid their fees for the very reason that under their established policy, the respondents would influence Vone to not implicate the accomplices. Under such circumstances, a full disclosure required that the respondents discuss with Vone the possibility that her attorneys' fees were being paid by her accomplices and that, if this were in fact true, disclose the conflict inherent in the representation. The convergence of the non-cooperation policy and the reasonable possibility that attorneys' fees were being paid by accomplices, impermissibly conflicted with the independence of the respondents' professional judgment. We conclude that by accepting payment from third parties under the reasonable possibility that said parties were accomplices, and at the same time counseling against cooperation with the government, the respondents violated Prof.Cond. Rules 1.7(b) and 1.8(f).

Having found misconduct, we must now assess appropriate disciplinary sanctions. We are mindful that Dillon's contact with the client was limited and that Maternowski was primarily responsible for the representation. However, Dillon's duty of loyalty to the client was in no way diminished by the infrequency of their contacts. He was bound by the very same duties and obligations inherent in the attorney-client relationship. *Matter of Smith*, 572 N.E.2d 1280 (Ind.1991). The free exercise of independent professional judgment on behalf of a client is a cornerstone of the attorney-client relationship. The subtle pressures inherently present when interests conflict erode away the element of trust which must exist in such a relationship. *Matter of Kern, supra.* The continued representation under such circumstances was potentially harmful to the client.

 In light of this, we find that suspension of both respondents for a period of 30 days is appropriate under the circumstances of this case. This disciplinary sanction comports with the *American Bar Association Standards for Imposing Lawyer Sanctions* [2] and with sanctions this Court has imposed in the past for similar misconduct.[3]

It is, therefore, ordered that Andrew C. Maternowski and Stephen W. Dillon are suspended from the practice of law for a period of thirty (30) days beginning January 20, 1997, after which the respondents shall be

---

2. *American Bar Association Model Standards for Imposing Lawyer Sanctions, Standard 4.32,* provides that suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

3. The Court suspended the respondent for 60 days for continuing to represent a client who was being offered immunity if he would testify against the respondent. *Matter of Kern, supra.*

automatically reinstated subject to the provision of Ind.Admission and Discipline Rule 23(4).